1              IN THE UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA

2                     MIAMI
             CASE NO. **17-CV-23429-MGC**

3   _____

4   **MICHAEL LAVIGNE, JENNIFER**
     **LAVIGNE, CODY PYLE, JENNIFER**

5   **RIBALTA, JEFF RODGERS, IZAAR**     **August 22, 2018**
     **VALDEZ, AND FELIX VALDEZ,**

6               Plaintiffs

7       vs.

8   **HERBALIFE LTD, HERBALIFE**
     **INTERNATIONAL INC, HERBALIFE**
     **INTERNATIONAL OF AMERICA INC,**

9   **ET AL.,**
               Defendants.

10  _____

11               MOTIONS HEARING

12       BEFORE THE HONORABLE **MARCIA G. COOKE**,

13     UNITED STATES DISTRICT COURT JUDGE

14  _____

             A P P E A R A N C E S

15

16  FOR THE PLAINTIFF:   **ETAN MARK**, ESQ
     MICHAEL LAVIGNE,     **LARA MCDONNELL-GRILLO**, ESQ

17  JENNIFER LAVIGNE, CODY Mark Migdal Hayden
     PYLE, JENNIFER       80 SW 8th Street, Suite 1999

18  RIBALTA, JEFF RODGERS, Miami, FL 33130
     IZAAR VALDEZ, AND     (305) 374-0440

19  FELIX VALDEZ        Etan@markmigdal.com
                     Lara@markmigdal.com

20

21               **JASON M. JONES**, ESQ
               1147 Hunter Avenue

22               Columbus, OH  43201
               (312) 237-0275

23               Jason@jonesatlaw.com

24

25

```
 1
                FOR THE DEFENDANT:      TODD A. LEVINE, ESQ
 2              HERBALIFE LTD,          ERIN E. BOHANNON, ESQ
                HERBALIFE               Kluger Kaplan
 3              INTERNATIONAL INC,      Miami Center, 27th Floor
                HERBALIFE               201 S. Biscayne Boulevard
 4              INTERNATIONAL OF        Miami, FL  33131
                AMERICA INC, ET AL.     (305) 379-9000
 5                                      Tlevine@klugerkaplan.com
                                        Ebohannon@klugerkaplan.com
 6
                                        MARK T. DROOKS, ESQ
 7                                      Bird Marella PC
                                        1875 Century Park East, 23rd Floor
 8                                      Los Angeles, CA 90067
                                        (310) 201-2100
 9                                      Mdrooks@birdmarella.com

10              FOR THE 44 INDIVIDUAL   MICHAEL S. CATLETT, ESQ
                DEFENDANTS:             Quarles Brady LLP
11                                      One Renaissance Square
                                        Two North Central Avenue
12                                      Phoenix, AZ  85004
                                        (606) 229-5200
13                                      Michael.catlett@quarles.com

14                                      ZACHARY S. FOSTER, ESQ
                                        Quarles Brady LLP
15                                      101 E. Kennedy Boulevard, Suite 3400
                                        Tampa, FL  33602
16                                      (813) 387-0273
                                        Zachary.foster@quarles.com
17

18
                REPORTED BY:            GIZELLA BAAN-PROULX, RPR, FCRR
19                                      United States Court Reporter
                                        400 North Miami Avenue, Suite 8S32
20                                      Miami  FL  33128
                                        (305) 523-5294
21                                      gizella_baan-proulx@flsd.uscourts.gov

22

23

24

25
```

<u>**P R O C E E D I N G S**</u>

*(The following proceedings were held in open court.)*

**THE COURT:**  We're on the record in Rodgers vs. Herbalife.

05:13   **MR. MARK:**  Etan Mark from the law firm Mark Migdal Hayden.  I'm here with my co-counsel, Jason Jones, and my partner, Lara Grillo.

**THE COURT:**  Thank you.  And appearing on behalf of the defendants?

05:14   **MR. LEVIN:**  Good afternoon, Your Honor.  On behalf of the defendants, Herbalife LTD,, Herbalife International, Inc., and Herbalife International of America, Inc., Todd Levin and Erin Bohannon from the law firm of Kluger Kaplan, and our co-counsel pro hac vice Mark Drooks from the law firm of Bird 05:14 Marella.

**MR. CATLETT:**  Good afternoon, Your Honor.  My name is Mike Catlett.  I'm from the law firm of Quarles Brady.  I hope it suffices to say that I represent 44 individual defendants in the case.

05:14   **THE COURT:**  I'll take your word for it.  You don't have to announce each one of them on the record.

**MR. CATLETT:**  I'm here with my colleague, Zac Foster, who is with our Tampa office, and he's local counsel for our clients in this case.

05:14   **THE COURT:**  All right.  There are two motions.  One is

1    docket entry number 62; the other is docket entry number 63.

2         There's defendant's motion to compel arbitration and

3    motion to transfer venue, and they are the two combined

4    motions.

05:15  5         So counsel, are the defendants, are you going

6    separately?  Together?  Which defendants are going to speak on

7    what topics?  Plaintiffs, you may have a seat.

8         **MR. DROOKS:**  Your Honor, I'm going to speak to

9    questions 2, 3 and 4, in your order.  And then Mr. Catlett will

05:15 10   address question 1 which relates primarily to the individual

11   defendants and then any other issues relating to them.  And

12   we'll argue those issues as to both motions at once.

13        **THE COURT:**  All right.  Go right ahead please.

14        **MR. DROOKS:**  Thank you, Your Honor.  May I use the

05:15 15   lectern?

16        **THE COURT:**  Right.

17        **MR. DROOKS:**  Thank you.  Your Honor, as I said a

18   moment ago, I plan to address the last three questions in your

19   order setting oral argument and leave for Mr. Catlett the first

05:16 20   question relating to the agency relationship.  But I'm prepared

21   to answer any and all questions you may have.

22        So to, in essence, cut to the chase to directly answer

23   the questions that you had asked in your order, the defendant's

24   position is that four of the defendants who executed

05:16 25   distributorship agreements between January 2010 and August

1   2013, are subject to the forum selection clause in the

2   distributor agreement and they are indicated here, Patricia and

3   Jeff Rodgers, Izaar Valdez and Jennifer Ribalta.  Four of the

4   defendants are subject to an arbitration clause in their

05:17  5   distributorship agreement.  Jennifer Lavigne, Michael Lavigne

6   by virtue of being Jennifer's husband and Cody Pyle executed

7   agreements after August 2013.  And those agreements contained

8   distributorship -- excuse me, contained arbitration agreements,

9   and also contain a class action waiver.  Felix Valdez had

05:17 10   executed an agreement in 2008.  And his agreement also contains

11   an arbitration clause and a class action waiver.

12          Our position is that irrespective of the contents of

13   the agreements, all of the plaintiffs are subject to the

14   arbitration clause and class action waiver in the rules.

05:17 15          In addition, with respect to the question relating to

16   the Bostick settlement, Patricia Rodgers, Jeff Rodgers, Izaar

17   Valdez and Felix Valdez are all Bostick class members and are

18   all members of the Bostick class subject to the Bostick

19   release.

05:18 20          Let me see if I can explain how we get to this which,

21   I assume, is what interests the Court.  I put on a timeline the

22   membership dates for each of the respective plaintiffs.  Izaar

23   Valdez, as you can see, was terminated in June 2011, and signed

24   up again in June of 2013, and was again terminated in June of

05:18 25   2016.  So the relevant dates for Izaar Valdez are 2013, not

1   2008.

2          So beginning at the beginning, so to speak, Felix

3   Valdez executed a membership agreement on June 15th, 2008, or

4   as of June 15th, 2008, which contains an arbitration clause in

05:19  5   it.  The arbitration clause is shown here, it's part of Roman's

6   declaration, Exhibit M, and it contains, although I failed to

7   highlight it, about two-thirds of the way down, a separate

8   class action waiver which reads, "Herbalife and I agree that no

9   claim shall be adjudicated in an arbitration or in any judicial

05:19 10   proceeding as a class action, and that no arbitration or other

11   proceeding conducted pursuant to this agreement shall allow

12   class claims or consolidation to a joinder of other claims or

13   parties.  It is a very broad arbitration clause relating to any

14   claim or dispute arising out of or relating to my

05:20 15   distributorship including," and it goes on.

16          In January 2010, the membership agreement,

17   distributorship agreement was amended and, indeed, the

18   arbitration clause was taken out and a forum selection clause

19   was placed in the agreement.  Between January 2010 and August

05:20 20   of 2013, plaintiffs Patricia Rodgers and, indirectly, her

21   husband Jeff, Jennifer Ribalta and Izaar Valdez all executed

22   that form of agreement.  That form of agreement which, as I

23   said, does not contain an arbitration clause, contains this

24   clause which provides that any claim shall be resolved

05:21 25   exclusively in a judicial proceeding in either the Superior

1    Court or the United States District Court, both located in Los

2    Angeles, California.

3         Now, Your Honor's question actually did not

4    specifically relate to which plaintiffs but which claims, and

05:21    5    the case law is quite clear that this agreement which at first

6    said any claim encompasses all of the claims at issue in this

7    case.  Those cases are cited in our moving papers and, again,

8    in our reply papers.  I'm happy to discuss them at length.  But

9    they are American Residential Equities and the PODS case, cited

05:21   10    at page 10 of our moving papers.

11         That's when things get interesting, Your Honor.  The

12    Bostick class action complaint is filed in April 2013, and as

13    you can see, Mr. Valdez, Patricia Rodgers, Jennifer Ribalta and

14    Izaar Valdez were all already members and were within the scope

05:22   15    of the putative class in Bostick.

16         In August 2013, after the Bostick complaint had been

17    filed and motion practice had proceeded in that case, Herbalife

18    began to incorporate in its arbitration -- in its

19    distributorship agreement, arbitration clauses and a class

05:22   20    action waiver directly into the agreement.  In July 2014 and

21    December 2014, Mr. Pyle in July 2014, Jennifer Lavigne in

22    December 2014, executed that agreement which directly contains

23    in the agreement a broad form arbitration clause to which they

24    are subject.

05:23   25         At the same time, Herbalife added an arbitration

1  clause and class action waiver to its rules.  The rules are

2  directly referred to and incorporated into the agreement

3  itself, for example, in Ms. Rodgers' agreement, the agreement

4  reads, "Those documents and such other rules and procedures as

05:23  5  Herbalife has published or in the future may publish together

6  with such modifications and amendments as Herbalife shall make

7  from time to time in its sole and absolute discretion.

8  Collectively, the rules are each hereby incorporated into this

9  agreement of distributorship, each in its most recently

05:24 10  published form."

11       So the incorporation of the rules which were first

12  incorporated in August 2013 and made available through the

13  website in October 2013 and, thereafter, sent by direct notice

14  to each of Herbalife's members in February 2014, place Felix

05:24 15  Valdez, Patricia Rodgers, Jennifer Ribalta and Izaar Valdez

16  within the scope of the arbitration agreement.

17       The agreement, as the Court will see from reviewing

18  Romans' declaration entered today, contains a very clear

19  indication that it was an arbitration agreement, it involves a

05:25 20  waiver of jury trial and a waiver of class action.

21       The Bostick case proceeds.  A settlement is reached.

22  And the settlement became effective on September 18th, 2015,

23  which was the last day for an objector to appeal the final

24  judgment in the case.

05:25 25       Now, that settlement agreement covered everyone in the

1   Bostick class with some exceptions, Your Honor, and for our

2   purposes, the Bostick class period and the Bostick settlement

3   reached -- and that is the Bostick release -- reached Felix

4   Valdez, Patricia and Jeffrey Rogers, and Izaar Valdez.  It did

05:26   5   not reach Cody Pyle and Jennifer Lavigne because he had

6   executed the new arbitration clause and class action waiver

7   agreements, and there was a specific carve-out for class

8   members who had executed that agreement after, I believe,

9   August or September 2013, to specifically accept them out of

05:26   10   the settlement.

11       It did not reach Jennifer Ribalta because Jennifer

12   Ribalta was one of about 15 hundred members who had achieved

13   what's called, "Get Team" status, one of the more or successful

14   members, and the plaintiffs in the Bostick case wanted the more

05:26   15   successful Herbalife members excluded from the class.  So as a

16   "Get Team" member, Jennifer Ribalta is excluded from the scope

17   of the Bostick release.

18       Now, an issue has been raised as to whether or not

19   Herbalife had ever taken the position that the arbitration

05:27   20   agreement entered into and -- entered into the rules in August

21   2013 operated to retroactively strip Mr. Valdez, Patricia and

22   Jeff Rodgers and Izaar Valdez of their ability to proceed in

23   the -- to proceed as members of the Bostick settlement class.

24   That issue was raised and Herbalife clearly took the position

05:27   25   that having had a complaint filed those claims asserted prior

1    to the arbitration agreement being incorporated into the rules,

2    and having Herbalife actively litigate the case before any such

3    arbitration clause was included in the rules, Herbalife made

4    clear that it was not taking the position that it was

05:28    5    attempting to retroactively impose the arbitration clause on

6    those defendants for claims that had already been asserted in

7    the Bostick litigation.

8            In any event, Your Honor, that brings us to the chart

9    that I began with and it explains the development of that

05:28   10   chart.

11           The forum selection clause became effective in January

12   of 2010 and covers a period through August 2013.  And,

13   therefore, covers the four plaintiffs I mentioned, Felix

14   Valdez, Jennifer and Michael Lavigne and Cody Pyle.

05:29   15          In August 2013, the class action agreement -- I mean

16   the class action waiver and arbitration clause was incorporated

17   into the agreement.  Which Jennifer Lavigne, Michael Lavigne

18   indirectly and Cody Pyle became subject to.  Felix Valdez, we

19   have to go back to 2008 to find the class action waiver and

05:29   20   arbitration clause in his agreement.

21          There we see the forum selection clause, and as I

22   indicated, all of these individuals, by virtue of having

23   continued as members for approximately four years after the

24   arbitration clause and class action waiver was incorporated

05:29   25   into the rules, that is between August 2013 and September 2017

1    when the complaint in this action was filed, are subject to

2    those rules by incorporation into the agreement as is in the

3    explicit terms of each agreement.

4            And Ms. Rodgers and each of the Valdezes, Izaar and

05:30  5    Felix, are within the scope of the Bostick settlement.

6            Now, Your Honor, if the question is which claims are

7    subject to each of these provisions, that is, has Patricia

8    Rodgers asserted any claims, that would not be subject to the

9    forum selection clause.  Our answer is all of her claims,

05:30 10    because all of her claims reasonably arise from her distributor

11    relationship with Herbalife, and the case law is very clear

12    that forum selection clauses ought to be read liberally to

13    encompass, not just contractual claims, but tort claims related

14    to the relationship.

05:31 15            The arbitration clauses are equally broad and include

16    not only claims arising from the distributor relationships, but

17    claims relating to relationships with other distributors.

18            So to the extent that Herbalife is being sued in

19    connection with the plaintiffs' claims for conduct of other

05:31 20    distributors, that is the individual defendants, those are

21    specifically included as well.  The class action waiver speaks

22    for itself as does the same language in the rules, and the

23    Bostick settlement is an extremely broad settlement that

24    reaches claims, known and unknown, as of the effective date of

05:32 25    the settlement.

1           So any claims, known or unknown, that existed as of

2    September 2015, fall within the scope of that release.  I think

3    there is the possibility that one more individual plaintiff

4    might try it take the position that a claim asserted here did

05:32   5    not arise until after that date.  I would suggest to you that

6    is a very tough road to hoe because they were all members for

7    years before, or at least substantial periods of time.  I think

8    up to about at least 18 months prior to the effective date of

9    the settlement, and actually all of the people subject to

05:32   10   Bostick settlements were members for over two years, and allege

11   that they attended these meetings and conferences before the

12   effective date of the Bostick settlement.

13           As I said, I think we have attempted to answer

14   questions 2, 3 and 4 in your order.  I understand that Your

05:33   15   Honor may have other questions or have questions as a result of

16   this presentation and this argument.

17           **THE COURT:**  I'm fine.  Can I hear from your co-counsel

18   at this point?

19           **MR. DROOKS:**  Thank you, Your Honor.

05:33   20           **THE COURT:**  Thank you.

21           **MR. DROOKS:**  Your Honor, we have a hard copy of the

22   presentation that we can provide at the end of the argument and

23   give a copy to our co-counsel.

24           **THE COURT:**  Thank you, Counsel.

05:33   25           **MR. CATLETT:**  Thank you, Your Honor.  As I mentioned

05:34   1   at the outset, we represent the 44 individual defendants that

  2   have been named in this case, plaintiffs' claim here that our

  3   clients engaged in a racketeering enterprise with each other

  4   and with Herbalife, and committed mail and wire fraud and also

05:34   5   engaged in a conspiracy to violate the racketeering statute.

  6   Now I know we're not here to talk about the merits of those

  7   claims or about the plaintiffs' allegations, but I would like

  8   to note that our clients take these allegations very seriously

  9   and they deny them emphatically.

05:34 10   What we are here to talk about today, though, is why

11   the Southern District of Florida is the wrong forum for the

12   plaintiffs' claims.  Our clients join in and fully support the

13   arguments that Mr. Drooks and Herbalife have made this

14   afternoon.  Our clients have similarly moved with Herbalife to

05:34 15   compel arbitration or, in the alternative, to transfer the case

16   to the Central District of California.

17   I want to talk about specifically this afternoon why

18   my clients can benefit or enforce the arbitration provision

19   that is contained in the rules and the agreements between

05:35 20   Herbalife and the named plaintiffs.

21   There's three reasons why they can do that.

22   First) they expressly agreed to -- named plaintiffs'

23   expressly agreed to arbitrate the claims they assert in this

24   case.  Second) the plaintiff should be estopped from denying

05:35 25   that their claims are subject to arbitration.  And third) their

1    claims are based on a theory that the individual defendants are

2    agents of Herbalife and that agency argument will address

3    question 1 in the Court's notice setting hearing.

4         First, with respect to the express agreement, each of

05:35  5    the named plaintiffs expressly agreed to arbitrate claims

6    arising out of disputes with other members in Herbalife,

7    including their claims in this case.  Plaintiffs did not

8    address this argument that we made in our opening brief at all

9    in their response brief.

05:36  10    The 2016 version of Herbalife's rules that Mr. Drooks

11    referred to earlier provides, in relevant part, that, quote,

12    Herbalife and distributor agree to arbitrate all disputes and

13    claims between them including, without limitation, disputes or

14    claims arising out of or relating to relationships with other

05:36  15    distributors.

16         My clients are similarly bound by those 2016 rules.

17    And so we think it's wrong to even refer with respect to my

18    clients to them as being non-signatories to the arbitration

19    provision.  My clients are bound by the arbitration provision

05:36  20    just as the named plaintiffs are bound by the arbitration

21    provision, and that arbitration provision clearly encompasses

22    claims arising out of or relating to relationships with other

23    distributors.

24         Count 1 of the complaint and Count 2 both are based on

05:37  25    plaintiffs' alleged relationship with the individual

1   defendants, who plaintiffs' claim misrepresented that attending

2   Herbalife events would result in greater compensation under the

3   Herbalife compensation claim.  Because those claims are

4   centered on plaintiffs' relationships with other distributors,

05:37  5   my clients are entitled to enforce the arbitration provision

6   which was intended to cover claims against them such as those

7   the plaintiffs' bring here.

8          We think this case is no different than the Griggs

9   versus SGE Management case that was cited in our papers.  It's

05:37 10   at 2015 Westlaw 11423656.  In that case, the plaintiffs'

11   brought a putative RICO class action against the direct sales

12   company, called S G E, and several of its hired distributors.

13   And that company happened to refer to its distributors as

14   independent associates, or IAs.

05:38 15          The procedures in that case provided, similar to the

16   rules here, that, quote, any claim between two or more IAs or

17   between any IAs and Ignite, the direct sales company, would be

18   subject to arbitration.  And despite that the individual

19   defendants were not technically signatories to any agreement

05:38 20   with the plaintiffs, the Western District of Texas held that

21   the RICO claims against the individual defendants in that case

22   were subject to arbitration under the express terms of the

23   arbitration agreement.  The same goes here.

24          Moving on to agency theory and the Court asked the

05:38 25   parties to address in its notice of hearing at question 1

1   whether an agent/principal relationship exists between

2   Herbalife and the individual defendants.  And our answer to

3   that question is that at this stage of the proceedings, and

4   based only on the allegations in the complaint, and I want to

05:39   5   make very clear that -- and emphasize that point, that this

6   argument is based on the beginning stage of the proceedings

7   here where all you're faced with is a complaint, and at this

8   point you must assume that the allegations in the complaint are

9   true, our clients disagree with those allegations but at this

05:39   10   point we're stuck with them.

11       The Court -- or those allegations are that Herbalife

12   and the individual defendants are co-conspirators and have

13   engaged in an enterprise or conducted concerted behavior.  And

14   California courts, and the rules in this case contain a

05:40   15   California choice of law provision, so the courts or the

16   parties with respect to this motion have focused on California

17   law.

18       The California courts have explained that the

19   essential element of establishing the existence of agency is,

05:40   20   quote, the right of the alleged principals to control the

21   behavior of the alleged agent.  And that's in the DeSuza versus

22   Andersack case, which is 63 Cal.App. 3d 694.

23       In the complaint, plaintiffs include allegations that

24   Herbalife exercises control over the individual defendants with

05:40   25   respect to the content, timing, and presentation of the events

1  that are the basis of their claims.  And those allegations can

2  be found at paragraphs 118 through 120, 144 through 146, and

3  paragraph 351 of the complaint.

4       For example, paragraph 351 alleges that, quote,

05:41  5  defendant Herbalife controls the event calendar, slotting the

6  local STS events in around its own schedule of larger corporate

7  sponsored events.  Herbalife dictates a standardized curriculum

8  for circle of success events, and controls the many trademarks

9  used in those approved presentations.  Herbalife lays out a to-

05:41  10  the-minute STS agenda, which is followed rigidly in most areas.

11       Not only do plaintiffs allege that the individual

12  defendants are Herbalife agents which, again, the Court has to

13  assume is true at this point, but their theory of relief

14  against Herbalife depends on there being an agency relationship

05:41  15  between the defendants.

16       In order to violate the racketeering statute, each

17  defendant must commit two or more predicate acts of mail or

18  wire fraud, which the case law refers to as a pattern of

19  racketeering.  Plaintiffs must plead the existence of predicate

05:42  20  acts with specificity under Rule 9(b).  When the Court reviews

21  the complaint, you will notice that plaintiffs do not allege a

22  single e-mail, letter, or communication that was transmitted by

23  Herbalife or any of its employees or executives in furtherance

24  of the alleged fraudulent scheme.  Thus, the only way that

05:42  25  plaintiff can plead that Herbalife engaged in a pattern of

1  racketeering activity is to have the individual defendant

2  statements or advertisements imputed to Herbalife, and the only

3  way they can do that is if the individual defendants are

4  Herbalife's agents.

05:42  5       Again, although Herbalife and the individual

6  defendants will strongly contest that theory of liability, and

7  the allegations of agency, throughout the entirety of this

8  case, it is sufficient for present purposes to allow the

9  individual defendants to enforce the arbitration provision.

05:43  10       Finally, with respect to equitable estoppel under

11  California law equitable estoppel applies where the complaint

12  alleges substantially interdependent and concerted misconduct

13  by the non-signatory and another signatory, and the allegations

14  of interdependent misconduct are founded in or intimately

05:43  15  connected with the obligations of the underlying agreement.

16  That standard is met here.

17       First, you need interdependent and concerted

18  misconduct.  At paragraph 349 of the complaint, the plaintiffs

19  allege that, quote, defendants jointly conduct, manage and

05:43  20  control the affairs of the circle of success enterprise.

21       At paragraph 363 of the complaint, plaintiffs allege

22  that defendants have intentionally conspired and agreed to

23  directly and indirectly conduct and participate in the conduct

24  of the affairs of the circle of success enterprise through a

05:44  25  pattern of racketeering activity.  Plaintiffs -- so that

1  satisfies the interdependent and concerted misconduct element.

2          Again, we dispute those allegations, but for purposes

3  of this motion, the Court must assume they're true.

4          Plaintiffs claims are also intimately connected to the

05:44  5  obligations of Herbalife distributor agreement, rules and

6  compensation plan.  I don't think that plaintiffs' dispute that

7  there's a contractual relationship between Herbalife and its

8  distributors, including the named plaintiffs, or that the

9  contractual relationship is based on the agreement, rules and

05:44  10  compensation plan.

11          I also don't think that the plaintiffs dispute that

12  the amount of money that Herbalife is required to compensate

13  its distributors is governed by the agreement, the rules and

14  the compensation plan.

05:44  15          Plaintiffs' primary allegation is that the defendants

16  misrepresented plaintiffs' future earnings under the contract

17  if they were to attend events.  In other words, defendants

18  up-sold the plaintiffs by promising future returns under the

19  contract.  The Court will not be able to determine whether any

05:45  20  such misrepresentation occurred, and plaintiffs' claims cannot

21  succeed without a careful analysis of the provisions of the

22  contract, and whether event attendance can contribute to

23  additional payments under the contract.

24          The Court need look no further than the complaint to

05:45  25  confirm that plaintiffs' claims are intimately connected to the

1    contractual documents between them and Herbalife.

2         At pages 69 through 70 of the complaint, the named

3    plaintiffs have set forth what they believe the common issues

4    are appropriate or across the class for purposes of Rule 23.

05:45 5       On page 70, and this is at paragraph 333 of the

6    complaint, subsection 7, the plaintiffs indicate that one

7    common issue is, quote, whether defendants intentionally

8    withheld material information about the likelihood and ability

9    of plaintiffs obtaining the promised results and monetary

05:46 10   returns from pursuing the Herbalife business opportunity.

11        The only way you can figure out or determine what

12   those promised results were, and what monetary returns

13   plaintiffs might have been pursuing under the Herbalife

14   business opportunity, is by referring to the Herbalife

05:46 15   agreements, rules and compensation plan.

16        Similarly, at subsection 8, they say a common issue is

17   whether defendants failed to disclose that President Team

18   members built their downlines by using now banned methods.  The

19   only way to determine what those banned methods are is by

05:47 20   referring to Herbalife's rules, agreements and compensation

21   plan.

22        Subsection 12 they saw common issues whether

23   distributors stacked their downlines with empty proxies to

24   facilitate their top down manipulation of the compensation

05:47 25   scheme.  The only way for the Court to know what the

1  compensation scheme is, is by referring to the rules,

2  agreements and compensation plan.

3       Finally, at subsection 18, the named plaintiffs say

4  the common issue that will need to be determined in this case

05:47  5  is, quote, whether defendants' disclaimers were legally

6  insufficient given the net impression created by defendants'

7  activities and the explicit intentional disavowal by defendants

8  and/or proxies of the substance of those disclaimers.  Those

9  disclaimers are contained within Herbalife's rules, agreements,

05:48 10  and compensation plan.

11       We also, in the alternative, have moved to transfer

12  venue to the Central District of California.  I think the

13  parties flushed out those arguments in their briefs.  And Mr.

14  Drooks hit on some of them this afternoon, so if Your Honor has

05:48 15  no questions, my clients respectfully request that you compel

16  the claims against them into arbitration or, alternatively,

17  that you transfer the claims against them to the Central

18  District of California.  Thank you.

19            THE COURT:  Let me hear from the plaintiffs.

05:48 20            MR. MARK:  Thank you, Your Honor.

21       Your Honor, I have a small binder, it's small.  I may

22  be referring to it throughout the hearing.  Would it be all

23  right if I approach?

24            THE COURT:  You may.

05:49 25            MR. MARK:  Good afternoon, Your Honor.  I just heard

1  counsel argue that the plaintiffs expressly agreed to arbitrate

2  this dispute by virtue of this 2016 version of the arbitration

3  provision.  There is absolutely no evidence in this record that

4  any of the plaintiffs signed, saw, agreed to, checked the box,

05:49  5  assented to this 2016 arbitration provision.  None.

6       The entirety of the defendants' case hinges on the

7  fact that Herbalife retained the right in its sole and absolute

8  discretion to amend the rules at any point in time by posting

9  those amendments to the website and then retroactively applying

05:50 10  those amendments to the various distributors.  And that's

11  exactly what they claim they did.

12       In 2016, they posted this amendment to the rules that

13  contained this lengthy arbitration provision, and they are

14  contending today that that 2016 amendment that they posted to

05:50 15  the Herbalife website applies to all of the claims in this

16  case.

17       There is no evidence, Your Honor, that they ever

18  provided notice to the plaintiffs with respect to this

19  amendment, and there's no evidence, Your Honor, that the

05:50 20  plaintiffs ever received this notice.

21       Now, the preliminary inquiry here -- and this is their

22  burden -- the preliminary inquiry here, Your Honor, is have the

23  parties mutually agreed to arbitrate this dispute.  No one

24  signed the August 2016 agreement that they are seeking to

05:51 25  impose.  So in answer to one of your questions which was which

1  claims are covered by the arbitration agreement contained in

2  the distributor agreements, the answer to that is none because

3  the 2016 arbitration provision that they're seeking to impose

4  was not agreed to by any of the plaintiffs in this case.

05:51  5      Second, Your Honor, the arguments that you have heard

6  Herbalife counsel, Herbalife make is the opposite, the absolute

7  opposite of the argument they made in the Bostick case where

8  the same law firm, Your Honor, that's representing Herbalife

9  today, in federal court in California argued that they would

05:51  10  never seek to do something so devious, and that's their word,

11  not mine, Your Honor, as retroactively applied an arbitration

12  provision to a group of people that never signed it.

13      Third, Your Honor, the distributor agreements are

14  illusory.  The reason they're illusory is because Herbalife

05:52  15  retains the right in those distributor agreements to amend them

16  unilaterally, and it does so without notice, and it does so

17  without what the Court's have called fairness, and both notice

18  and fairness are requirements in order to save this agreement

19  from being illusory, all of these distributor agreements, Your

05:52  20  Honor.

21      Fourth, Your Honor, the terms of use of the website

22  provide that they supercede any other agreement relating to

23  Herbalife's goods, services, or use of the website.  This

24  website is the same website that Herbalife requires its

05:53  25  distributors to go to to stay up-to-date with the rules.  And

1  it is the only policy of Herbalife that contains this

2  superseding language, of which I'm aware.

3       And Herbalife's senior director of member

4  administration, I believe is her title, testified in this case,

05:53  5  Your Honor, that those terms of use are incorporated into each

6  and every distributor agreement that is at issue before your

7  court today.

8       And finally, Your Honor, with respect to equitable

9  estoppel, you heard counsel refer to the complaint.  This is

05:53  10  about, again, their burden.  There's no basis for equitable

11  estoppel here because what equitable estoppel requires in this

12  case is reliance on the provisions of the distributor

13  agreements and the plaintiffs' claims are not bound up with

14  those distributor agreements.

05:54  15       So let's take a step back and remember the standard

16  here, Your Honor.  The defendants need to establish that there

17  was an agreement to arbitrate by a preponderance of the

18  evidence, and the defendants have failed to establish that, in

19  fact, the November 2016 arbitration provision that no one

05:54  20  signed or agreed to applies to the plaintiffs' claims here.

21       Now, Your Honor, the question is not do the terms of

22  use conclusively apply.  It's not whether the agreements are

23  definitively illusory.  That does not need to be definitively

24  decided today, Your Honor.  The question is with all reasonable

05:54  25  inferences in the plaintiffs' favor, Your Honor, have the

1  defendants shown, by a preponderance of the evidence again,

2  that an agreement to arbitrate was made.

3          So, let me drill down a little bit more, Your Honor.

4  The agreement to arbitrate the 2016 agreement, no one

05:55  5  acknowledged receipt of it.  No one checked a box saying that

6  he or she received it.  And Your Honor, if you turn to tab 1 of

7  the binder you'll see a little blue flag.  This is the

8  deposition testimony of Roxanne Romans.  This is the senior

9  director of member policy administration of Herbalife.

05:55  10          She testified that the plaintiffs when I asked her,

11  "Is it your understanding that the plaintiffs are bound by

12  these rules, regardless of whether or not they received

13  notification?"  Her answer to that is, "Yes."

14          When I asked her whether any investigation was done as

05:55  15  to whether the distributors actually received any of these

16  notifications, Your Honor, the answer was, "I don't remember."

17  We are talking about the basic constitutional rights to a jury

18  trial, we are talking about the basic right to be in a

19  courtroom, and, of course, the class waiver, which is the real

05:56  20  basis, the real reason they're filing this motion.

21          Bostick and the Bostick contradiction.  You've heard

22  counsel refer to the Bostick case.  What Herbalife argued in

23  Bostick, Your Honor, about three years ago, this is textbook

24  judicial estoppel.  This is textbook opportunistic flip-

05:56  25  flopping taking one position when it's convenient to take that

1  positions, two-and-a-half years ago, and taking the exact

2  opposite position in court today.

3      Bostick covers a class and damages going from April

4  2009 through December of 2014.  That's the general class of

05:56  5  Bostick.  When the Bostick settlement was entered into, Your

6  Honor, and I'll draw your attention to tab 3, and all of these

7  documents are on the record, Your Honor.  The third page of tab

8  3 provides for the Bostick exclusion that counsel was referring

9  to, 1.13.2.  "Also, excluded from the settlement class are all

05:57  10  Herbalife members or distributors who have agreed to be subject

11  to the arbitration provisions of the arbitration agreement."

12      That was contained in the member application revised

13  during or after September of 2013.  So there's an exclusion, an

14  express exclusion in the -- out of the class of Bostick that

05:57  15  says we're not going to apply Bostick to anyone that agreed to

16  be bound -- I'm sorry, that agreed to be subject to arbitration

17  provisions.

18      So, Your Honor, at tab 4 you'll see a colloquy between

19  counsel for the objectors of Bostick and counsel for Herbalife.

05:58  20  And in that colloquy, counsel for the objectors pointed out

21  that a sort of bizarre idea:  What happens if Herbalife at some

22  point in the future has the audacity to take the position that

23  the arbitration agreement applies retroactively to those

24  members, such as Patti Rodgers, one of the plaintiffs in this

05:58  25  case, that that arbitration agreement would apply retroactively

1   to her, even though she never agreed to arbitration, because

2   Herbalife has a unilateral right to amend their contracts and

3   impose those changes on anybody at any point in time.

4           If they sought to do that, then the theory would be

05:58   5   that the entire Bostick class would be extinguished.  So the

6   objectors pointed that out.  And at page 12, Your Honor, of tab

7   4, counsel for the objectors stated the way Herbalife functions

8   is that when they implemented it, meaning the arbitration

9   provision in September 2013, that it became part of the deal.

05:59   10   That was the concern raised by the objectors.

11           Counsel for Herbalife, his name is Judd Matz (ph.),

12   he's with the same firm that Herbalife is being represented by

13   today, the bottom of page 15 he states, and again, Your Honor,

14   I'm at tab 4, "It's not fair to characterize what we're doing

05:59   15   in this Court, in any court so publically and so openly as a

16   devious effort to manipulate the record.  If we were to do what

17   he is speculating we were to do," meaning counsel for the

18   objectors, "and to bind all of the other people who are not

19   signatories, there would be such an avalanche of adverse

05:59   20   consequences, including from this Court, that I think there's

21   no basis whatsoever to accept his concerns on that front."

22           That was the statement made by counsel for Herbalife.

23   You don't have to worry about that, Judge.  We would never do

24   something like that, and at tab 5, Your Honor, you'll see the

06:00   25   minutes from the Court where the Court states at the bottom of

tab 5, "To the extent the objectors contend that all current

Herbalife members and distributors are subject to the 2013

arbitration agreement via this clause, the Court disagrees.

The objectors have cited no authority for the proposition that

these members and distributors could be subject to an

arbitration provision contained within an agreement they

neither agreed to nor signed at the time they joined Herbalife

simply because the company retains the right to amend its rules

and policies, nor is it clear to the Court that a binding

contract, such as an arbitration agreement, could be included

within the definition of a corporate rule or policy, yet, here

we are, Your Honor, about three years later, and that's exactly

what Herbalife is trying to do.

And again, Judge, there are three elements to judicial

estopped.  Clearly inconsistent with the prior position, yes.

Successful in asserting that position, yes.  Deriving an unfair

advantage or seeking to derive an unfair advantage, yes, Your

Honor.  The three criteria are met and judicial estoppel should

apply here, Your Honor.

I want to touch on Herbalife's ability to unilaterally

amend this contract in its sole and absolute discretion, which

is in every agreement.  Tab 6, 7, 8, 9, 10 of the binder I've

handed you, those are the various agreements, and they each

contain a provision in sum or substance, and I'm looking at now

tab 6, which is Mr. Felix Valdez's application that says that

1   the document and such other rules and policies as Herbalife has

2   published, or in the future may publish, together with such

3   modifications and amendments as Herbalife shall make from time

4   to time in its sole and absolute discretion are hereby

06:02  5   incorporated into this agreement of distributorship in its most

6   recently published form.  So what Herbalife does when these

7   people sign these applications is they say, "We are reserving

8   the right to amend this at any point in the future, and then

9   incorporate it into the agreement you signed, even though these

06:02  10   documents don't even exist at the time you're signing this

11   distributor application."

12        So this is, on its face, Judge, an illusory contract.

13   This is an illusory contract.  The right to unilaterally amend

14   a contract renders it illusory, unless it is subject to two

06:02  15   things, Your Honor, notice and fairness, and in every case

16   where the unilateral right to amend was upheld, there was a

17   real actual notice provision.

18        In the Harris case, Your Honor, which is cited in

19   everybody's papers, the amendment required 30 days written

06:03  20   notice before it came into effect, and the modification had to

21   be signed and agreed to by both parties.  In Peleg, Your Honor,

22   which is 204 Cal.App. 1425, and both Harris and Peleg are in

23   the binder I handed you, Your Honor, the Court found that the

24   contract was not illusory under California law where there was

06:03  25   a provision requiring 30 days written notice.

1          And these are their cases, Your Honor.

2          Now, Roxanne Romans, again, this senior member of

3   policy administration, she's admitted, she doesn't know whether

4   the plaintiffs ever even got the notice.  And she has stated

06:04  5   that it doesn't matter whether they did or didn't.  And, again,

6   Your Honor, there's no evidence.  And I am not aware, Your

7   Honor, of any case that exists where the defendants moved to

8   compel arbitration and provide no evidence that the plaintiffs

9   ever even got notice of the amendment.

06:04  10          So we don't have notice, Your Honor.  Notice and

11   fairness are required.  There's neither.

12          Fairness.  Fairness means you're not going to

13   retroactively apply a change to someone who never affirmatively

14   assented to it.  That's exactly what Herbalife is doing.

06:04  15   They're taking the 2016 arbitration provision, which is

16   different from the 2015 arbitration provision, which is

17   different from the 2014 arbitration provision, which is

18   different from the 2013 arbitration provision.  They're taking

19   the 2016 arbitration provision and they are seeking to apply it

06:05  20   to all of the conduct and all of the allegations in the

21   complaint, the allegations that occurred in 2014, the

22   allegations that occurred in 2015, the allegations that

23   occurred in 2013, et cetera, Judge.  So that's exactly what

24   they're doing.  They're retroactively applying it.

06:05  25          The terms of use, Your Honor, this really drives home

1   what a mess Herbalife has made of all of this.  It's not -- you

2   don't need to decide whether it's the website terms of use that

3   apply, or whether it's this other provision that may apply,

4   whether it's the 2014 arbitration provision, or the 2008

06:06   5   arbitration provision that Mr. Valdez signed and which is, on

6   its own, substantively unconscionable.  The two thousand and --

7   I'm sorry, the website terms of use were last revised in

8   February of 2017.  The reasons the terms of use are so

9   important, Your Honor, the website terms of use, is because the

06:06  10   entire -- and I've been practicing this phrase, Your Honor --

11   sine qua non, okay, of the defendant's case is that the

12   plaintiffs are required to stay apprised of these amendments to

13   the rules by going onto the website.  That's how they stay

14   apprised.  Roxanne Romans testified that the only way the

06:06  15   members could even stay apprised of these rules is by going to

16   that website.  The only way that these distributors could

17   conduct business is by going to that website.  And the terms of

18   use which are found at tab 2, Your Honor will see they're last

19   revised February 2nd, 2017, and they provide that this

06:07  20   agreement sets forth the legal terms and conditions governing

21   your use of this website which, again, Your Honor, they say you

22   have to use to stay apprised of the rules, and your purchase or

23   use of any Herbalife goods, services, referred to as "the

24   offerings."  That is what their own terms of use say, and those

06:07  25   terms of use also provide that they expressly supercede all

1  other prior arrangements, understanding, negotiations and

2  discussions.

3      The terms of use, of course, do not contain an

4  arbitration provision.  They provide a clause that requires any

06:08  5  lawsuit to be brought in federal district court.  Considering

6  the defendant's burden here, Your Honor, to demonstrate by a

7  preponderance of the evidence that there was an agreement to

8  arbitrate made, we don't believe that they have met that

9  burden.

06:08  10      With respect to equitable estoppel and agency, Your

11  Honor asked a very good question earlier relating to agency.

12  Herbalife's own documents, which are in the rules of conduct

13  that they've attached to their motion to compel arbitration,

14  expressly provide that distributors are not agents.  In fact,

06:08  15  the language is significantly broader than that.

16      Rule 3.1.2 of the rules state that, "A distributor is

17  an independent contractor.  Distributors conduct their

18  Herbalife businesses as self-employed, independent contractors.

19  A distributor is not an employee, agent, franchisee, securities

06:09  20  holder, joint venturer, fiduciary, or beneficiary of Herbalife

21  or any other distributor.  As independent contractors," it

22  continues, "distributors do not have the rights or benefits

23  that employees or agents of Herbalife may have and will not

24  make any claim to the contrary."

06:09  25      So that's Herbalife's own document and that's found at

1   -- the Bates stamp is HLF 000682, that's in version, I believe,

2   33 of their rules of conduct.  So we don't have an agency

3   relationship here.

4              And they've, of course, submitted no evidence to Your

06:10   5   Honor that there is an agency relationship, and they've not

6   argued in their papers that the basis for compelling that --

7   the individual defendants compel arbitration is by virtue of

8   this agency relationship.  They've not made that argument.

9   They're trying to hinge their argument on equitable estoppel.

06:10  10             The goal of the KPMG case, which I included in tab 15

11   of the binder, Your Honor, 173 Cal.App. 4209 recites directly

12   on point.  The question for the Court is, with respect to these

13   individual defendants, are the claims asserted by the

14   plaintiffs against the non-signatories the 43, 46 individual

06:11  15   defendants, quote, bound up with the contractual obligations of

16   the agreement?

17             The argument that the individual defendants make is

18   exactly the same that the defendant made in the KPMG case, that

19   it's only logical they would have to rely on the distributor

06:11  20   agreement to seek to impose liability on the individual

21   defendants because that formed the predicate of the

22   relationship.

23             The Court expressly rejected that concept, Your Honor,

24   and reiterated that the plaintiffs' allegations must, quote,

06:11  25   rely on the agreement, not simply the fact that the agreement

1  exists, and with respect to it being inextricably intertwined,

2  again, we can look to the KPMG case for guidance.

3      In that case, the defendants argue that there was a

4  tax shelter scheme that could only be accomplished via these

06:11  5  operating agreements that contained an arbitration provision,

6  and the Court still rejected that argument because the

7  complaint was not relying on the relevant agreement.  The

8  complaint is not attached to -- I'm sorry, the distributorship

9  agreement is not attached to the complaint, it's not referred

06:12 10  to in the complaint.  There is no provision.  There was no

11  right.  There was no obligation within that distributorship

12  agreement that the plaintiffs are seeking to impose on the

13  individual defendants.

14      So, Your Honor, it's our position that the defendants

06:12 15  have failed to meet their burden.  The motion to compel

16  arbitration should be denied.

17      And briefly, Your Honor, on the issue of transfer.

18  The motion to transfer is only really founded on claims brought

19  by four out of seven -- I'm sorry, four out of eight of the

06:12 20  plaintiffs against three out of 47 of the defendants.

21      Of course, the predicate to the forum selection

22  analysis is whether there's a valid forum selection clause in

23  the first instance.  I defer that we believe the contract is

24  illusory, is entirely illusory, so we don't think that that

06:13 25  exists.

1          The forum selection clause that they rely on provides

2    for -- it doesn't say any lawsuit arising out of or relating

3    to.  It says any claim, doesn't define claim, but there's a

4    capital C so it implies there's definition.  There is no

06:13   5    definition in the documents.  Any claim should be brought in

6    the Federal District Court in California.

7          Now, the Atlantic Marine case that the defendants rely

8    on, that case provides that where you have a valid forum

9    selection clause, that the parties -- that the Court should

06:13  10    disregard the private interest factors, that is that the

11    plaintiffs' choice of forum and all those other private

12    interest factor and accept that the forum selection clause is

13    going to govern at least with respect to those private interest

14    factors.

06:14  15          That doesn't apply in the case where you have some

16    parties that agreed to a forum, an outside forum, and some

17    parties that did not agree to an outside forum.

18          Here, Your Honor, we do have to consider the private

19    interest factors.  We have four plaintiffs that reside in

06:14  20    Florida, more than any other state.  We have 20 defendants that

21    reside in Florida, far more than any other state.  The

22    complaint is peppered with allegations relating to all of the

23    conduct that occurred in Florida.  There are 37 different event

24    flyers that are alleged in the complaint and that are attached

06:14  25    to the complaint.  And we're talking about things such as the

1  convenience of the parties.  All of that inures to Florida

2  being the appropriate forum.

3          And of course, Judge, the vast majority of the parties

4  in this action never, never agreed to bring this case in

06:15  5  California.  There are four out of, again, 50-something parties

6  that did.

7          So, Your Honor, we believe, again, their burden, they

8  have failed to meet their burden.  And that the motion to

9  transfer should be denied as well.

06:15 10          If Your Honor wishes me to deal with Bostick, I'm

11  happy to.

12          **THE COURT:**  I think I have enough information to rule

13  on the matters before me, Counsel.

14          **MR. MARK:**  Thank you very much, Your Honor.

06:15 15          **THE COURT:**  All right.  I have two docket entries,

16  docket entry 62 and docket entry number 63.

17          Now, there are certain plaintiffs that have signed the

18  distribution agreement that had a valid arbitration provision,

19  and that provision is limited by the implied covenant of good

06:16 20  faith and dealing.  I know there's this argument that there

21  ought to be an illusory contract, I don't find that argument

22  convincing.

23          Defendants' motion to compel arbitration is granted as

24  to claims against Herbalife made by plaintiffs Jean Lavigne,

06:16 25  Michael Lavigne, Cody Pyle and Felix Valdez.  The motion to

1   compel arbitration is denied in all other respects and to any

2   other plaintiffs because certain plaintiffs signed a

3   distributor agreement with a valid forum selection clause and

4   given the balance of the factors that I need to determine in

06:16   5   their favor.  The defendants' motion to transfer venue is

6   granted as to the claims involving Jen Ribalta, Patricia

7   Rodgers, Jeff Rodgers and Izaar Valdez.

8        The motion to transfer venue is denied in all other

9   respects.  And the claims against the individual defendants

06:17   10   remain.

11        A written order will issue.  Thank you very much,

12   Counsel.

13        **MR. MARK:**  Thank you, Your Honor.

14

15

16        (Thereupon, the above hearing was concluded.)

17

18                *         *         *

19

20

21

22

23

24

25

1                        **C E R T I F I C A T E**

2

3          I hereby certify that the foregoing is an accurate

4   transcription of the proceedings in the above-entitled

5   matter.

6

8       08/24/2018

9   DATE COMPLETED          GIZELLA BAAN-PROULX, RPR, FCRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25