# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 17-23429-Civ-COOKE/GOODMAN

PATRICIA RODGERS, CODY PYLE,
JENNIFER RIBALTA, IZAAR VALDEZ,
FELIX VALDEZ, JOANNA KIRBY, on
behalf of themselves and all others similarly
situated,

       Plaintiffs,

vs.

MARK ADDY, JILLIAN ADDY,
CODY MORROW, SUZANNE MORROW,
GABRIEL SANDOVAL, JOHN TARTOL,
LESLIE STANFORD, DANIELLE
GRACE, ALCIDES MEJIA JR., PAULINA
RIVEROS, CAROL ROSENAU, AMBER
WICK, JORGE DE LA CONCEPCIÓN,
DISNEY DI MARTINEZ, RYAN BAKER,
DANIEL WALDRON, SUSAN
PETERSON, MICHAEL KATZ, ALAN
RODRIGUEZ, and MARY HOLLOWAY,

       Defendants.

_____/

## AMENDED COMPLAINT

      Plaintiffs PATRICIA RODGERS, CODY PYLE, JENNIFER RIBALTA, IZAAR
VALDEZ, FELIX VALDEZ, and JOANNA KIRBY (collectively, "Plaintiffs"), by and
through their undersigned counsel, bring this action against MARK ADDY, JILLIAN
ADDY, CODY MORROW, SUZANNE MORROW, GABRIEL SANDOVAL, JOHN
TARTOL, LESLIE STANFORD, DANIELLE GRACE, ALCIDES MEJIA JR.,
PAULINA RIVEROS, CAROL ROSENAU, AMBER WICK, JORGE DE LA
CONCEPCIÓN, DISNEY DI MARTINEZ, RYAN BAKER, DANIEL WALDRON,
SUSAN PETERSON, MICHAEL KATZ, ALAN RODRIGUEZ, MARY HOLLOWAY
(collectively, the "Defendants") and allege as follows:

1

**INTRODUCTION**

1.     This action seeks recovery from a corrupt organization of individuals who act together, using misrepresentation and deceit, to sell access to a system of emotionally manipulative live events.

2.     The events are pitched as the guaranteed pathway to attaining life changing financial success with the multi-level marketing business opportunity sold by Herbalife International of America, Inc. ("Herbalife").

3.      The Defendants in this case are a select subset of Herbalife's highest earners that play or have played a material role in the Herbalife event system (the "events"), known within Herbalife as the "Circle of Success." These highest earners and collaborators will be referred to herein as the "top distributors".

4.     It is through these events that Herbalife (which is not a party to this case) and the Defendants here purported to showcase so-called "expert" marketing practices that would provide the foundational tools for the Plaintiffs and the class they represent to achieve this success.



GIOIOSA000209

5.     There is a big Event every month; and every month events are pitched as material and necessary to succeed in the Herbalife business model.

2

6.       "If you go to all the events, you qualify for everything — you will get rich." Defendant Mark Addy made this promise to thousands of event attendees on October 26, 2011, echoing a sentiment that's been expressed at events across the country each month for a decade.

7.       But the only people attaining "life changing financial success" are those at the apex of the scheme — those top distributors that constitute just a tenth of one percent of those that participate in the Herbalife business opportunity.

8.       There is no recognized correlation between event attendance and success in Herbalife. Both Herbalife and the top distributors know this. But undeterred and in an effort to secure their downline income stream, the top distributors forge ahead, and operate a unified nationwide live event system specifically designed and marketed as the essential ingredient to guaranteed financial success with the multi-level marketing business opportunity offered by Herbalife.

9.       For Herbalife and the top distributors, the events are crucial to "cement belief" in the Herbalife scheme, thereby increasing lower-level distributor engagement and retention.

10.       But for these low-level distributors, events are an expensive hardship that increase the duration and intensity of the losses suffered by the overwhelming majority of people who participate in the Herbalife business opportunity.

11.       In 2009, Herbalife and the Strategy & Planning Committee ("S&P Committee") made a decision — spearheaded by Defendant Dan Waldron — that Herbalife would divest control over a large part of the event system to top distributors. Under the plan, most Circle of Success tickets would be sold by top distributors rather than by Herbalife. The event system grew rapidly under the systematic control of top distributors.



12.     The Circle of Success enterprise is closely controlled by the S&P Committee and by a network of regional leadership committees that take their cues from the S&P Committee.  Every single one of the Defendants either currently is, or during the relevant period has been, a member of the S&P Committee.

13.     As discussed below, top distributors utilize the wires to promote event attendance to Plaintiffs and class members, to plan and organize specific events, to sell tickets and to hold regularly scheduled meetings of the S&P Committee.

14.     Top distributors serve as featured speakers at these all-day events. They tell participants that they have achieved freedom and financial security through the Herbalife business opportunity — and that the path was simple, duplicatable, and revolved around working the business "from event to event."

15.     But top distributors intentionally misrepresented (and continue to misrepresent) their success and how that success was achieved. It was not achieved through event attendance, nor was it achieved through adherence to the business strategies these top distributors sell. In fact, it is not possible to attain the financial freedom touted at events by engaging in the techniques promoted at events.

16.     Attending Circle of Success events is valueless.

**JURISDICTION AND VENUE**

17.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Plaintiffs assert claims under 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d).  The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), as members of the putative class are citizens of a State different from one or more Defendants and the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

18.    This Court may exercise supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

19.    This Court has personal jurisdiction over the Defendants in this matter. Defendants Grace, Mejia, Wick, De la Concepción, Di Martinez, Rodriguez, Rosenau, and Riveros are each residents of Florida. All Defendants have committed tortious acts in Florida, including making and facilitating misrepresentations at Circle of Success events in Florida, disseminating false information over the wires in Florida, and each Defendant has engaged in substantial and not isolated activity in Florida.

20.    Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1391, because substantial events giving rise to this Complaint took place in this District.

**PARTIES**

21.    Plaintiff Patricia Rodgers resides in Miami, Florida. Ms. Rodgers signed up to be an Herbalife distributor June 23, 2010, and attended more than twenty Circle of Success events.

22.    Plaintiff Izaar Valdez resides in Miami, Florida. Ms. Valdez signed up to be an Herbalife distributor on June 14, 2008, and again on March 22, 2013, and attended more than twenty Circle of Success events.

23.    Plaintiff Felix Valdez resides in Miami, Florida. Mr. Valdez signed up to be an Herbalife distributor on June 14, 2008, and attended more than twenty Circle of Success events.

24.    Plaintiff Jennifer Ribalta resides in Palm Harbor, Florida. Ms. Ribalta signed up to be an Herbalife distributor February 14, 2011, and attended more than twenty Circle of Success events.

25.     Plaintiff Cody Pyle resides in Oklahoma City, Oklahoma. Mr. Pyle signed up to be an Herbalife distributor July 7, 2014, and attended more than twenty Circle of Success events.

26.     Plaintiff Joanna Kirby resides in Phoenix, Arizona. Ms. Kirby signed up to be an Herbalife distributor September 6, 2009, and attended more than twenty Circle of Success events.

27.     Defendants (detailed below) are top distributors for Herbalife International of America. Herbalife markets a multi-level marketing business opportunity — selling weight loss products and health supplements — through a network of "independent distributors". Defendants control the operation of the Circle of Success enterprise in conjunction with Herbalife.

**The Event Cycle**



28.     Top distributors constantly reiterate the central importance of attending Circle of Success events and of getting guests and prospects to do the same.

- "Our ultimate goal with everything we do in our precess[*sic*] is getting people plugged into the Herbalife Event Calendar," President's Team member Jorge de la Concepción Jr.

- Events are the, "FASTEST way to build the BIGGEST checks in the SHORTEST period of time," President's Team member Andrea Villegas-Shanahan.

- "There is a DIRECT CORRELATION between the amount of people you bring to an event and your position in the Herbalife Marketing Plan! It is impossible to explain (or re-create) the excitement and impact of 300, 400, 500+ people in a room, all excited and talking about their results and how Herbalife has changed their lives." See Composite Exhibit 1.

29.    There is an expensive event to attend every month and distributors are told that the events are "non-negotiable" if they want to have success. Small events feed into larger events; larger events feed into smaller events — Herbalife and the top distributors work together to keep the wheel perpetually spinning.



### The Success Training Seminars

30.    Nine months a year — in 125 cities across the country — Herbalife's top distributors produce, market, and sell thousands of tickets to Success Training Seminars ("STS"). Tickets range in price from $25 – $50.

31.     The STS is an all-day event at which 50 – 1200 participants are presented with a barrage of Herbalife success testimonials in a manufactured high-energy environment; receive rudimentary "training" on products and recruiting methods; and are pressured to purchase tickets for, and attend, future events.

32.     According to Herbalife, "the Success Training Seminar (STS) is designed to teach expert techniques for achieving business success." Herbalife provides PowerPoint presentations presenting the products and the marketing plan, videos, disclaimers, trademarks, and agendas to all event organizers — the use of these materials is strongly encouraged by Herbalife. See Exhibit 2 Herbalife provides additional levels of support to STS events based on the event's size, history, and the make-up of the local leadership team.

33.     Local leadership teams consist of top distributors living in the local area — sometimes in conjunction with top distributors living elsewhere who maintain large local downlines. Leadership teams customarily represent multiple downlines — people who are ostensibly independent competitors in the same marketplace.

34.     STS tickets are sold both by utilizing various online ticketing platforms and in person during Circle of Success events. Proceeds from STS ticket sales typically flow into single purpose business entities, often with multiple members of the local leadership team having access to the accounts.

35.     The significant manpower required to put on the STS is provided by large "production teams" of "volunteer" distributors. Production team distributors are encouraged to spend long hours working uncompensated behind the scenes to prove themselves to local leadership.



*(Posted to the Miami STS Facebook page March 8, 2016)*

36.     A list of distributors and guests who have attended any given STS event is compiled at a registration table and that information is relayed back to Herbalife. Events that fail to relay attendance data back to the company risk losing Herbalife's support for future events.

37.     Local leadership groups select a top distributor, usually from another region, to serve as the featured speaker for each event. The featured speaker's travel costs and accommodations are paid by the local STS entity.

38.     The fact that a featured speaker is from a different region is of no consequence. Herbalife and the top distributors market the lessons and strategies taught at any given Circle of Success event to be replicable anywhere in the world, by anyone, at any time…so long as they continue attending events. As Defendant Amber Wick explained to an audience of thousands at the 2011 Extravaganza:

> *We are all team Herbalife. We all work together. You can go to any STS, in any city, in any part of the nation, and feel confident that your brand-new distributor's going to get the information they need to move their business forward.*

39.     The lessons and strategies taught at each event are materially the same. These messages are hatched at S&P Committee meetings and delivered by featured speakers who repeat the same trivialities over and over — with an occasional inconsequential change in language or background music.

40.     Top distributors heavily promote the STS events via leadership-controlled websites, social media pages, mass emails, and group chat applications. Top distributors encourage members of their downline to echo these promotions utilizing their own social media profiles, providing tangible incentives to members of their downline that succeed in attracting new talent to these events.

41.     The STS is described by top distributors as the core, backbone, and fabric of Herbalife as currently constituted. Local meetings, nutrition clubs, fitness and weight loss challenges, social media posts — all of Herbalife's so-called "Daily Methods of Operation" — are aimed at finding prospects to feed into the STS.

### Leadership Development Weekend

42.     Leadership Development Weekends ("LDW"), traditionally held in April and October, are large regional events sponsored and sold by Herbalife in some twenty-five cities across the country. The weekend long events cost $75 – $110 to attend and require most participants to travel and stay two nights in a hotel.

43.     The LDW offers the same basic content as the STS with larger venues and bigger crowds adding to the emotional impact of the event. LDW agendas are developed by the S&P Committee.

44.     LDW speakers are selected by local leadership in conjunction with Herbalife and the S&P Committee. Herbalife provides travel and accommodations for featured speakers and compensates certain speakers handsomely for their participation in these events.

45.     As with the STS, the LDW is staffed by a production team of business opportunity participants working uncompensated behind the scenes to produce the very events they are paying to attend.

### January Kickoff (formerly "Spectacular")

46.     The January Circle of Success event is a hybrid of the STS and the LDW and is held in approximately twenty-five cities across the country. Herbalife pays for the speaker and event venue costs while the top distributors retain all revenues from the $40 – $60 tickets.

47.     The following slide was prepared by Herbalife for use in S&P Committee meetings and illustrates how the company shares responsibility for the January event with local leadership.



48.     Herbalife's head of North American Sales and Strategy has stated that this arrangement allows local STS entities to "begin the year with a . . . bank for future events, future STSs."

49.     Herbalife utilizes the January Circle of Success event to seed favored local leadership teams with capital to operate STS events; which feed into LDWs; which feed into Extravaganza — rinse, repeat.

<u>**Extravaganza**</u>

50.     Extravaganza, a national event frequently attended by more than 20,000 people paying between $90 – $175, is pushed aggressively by speakers at Circle of Success events throughout the year. Extravaganza tickets are sold over Herbalife's website but are also available for purchase at STS and LDW registration tables as much as six months prior to the event.

51.   Extravaganza is billed as a life changing event worth any level of sacrifice or risk to attend. On a September 26, 2012 conference call Defendant Amber Wick offered the following advice promoting Extravaganza:

> *Like what if this is the thing that could change the course of my life forever? And because of a measly $1,000 which I get, you guys. When you don't have it, it's not measly. It is everything in the world. I so get it... And I took a serious risk and put another grand on a credit card. Okay? So what we did, we made the commitment. We get to that event... I cannot tell you where Jason and I would be today had we not gone to that event. It absolutely has changed the course of our entire lives.*

52.   Extravaganza speakers are selected by the S&P Committee. Extravaganza agendas are developed by the S&P Committee.

### The Strategy & Planning Committee

53.   Herbalife's S&P Committee has been exerting significant influence over Herbalife since the very early days of the company. The committee currently consists of:

- Distributors who qualify for the top two rungs of Herbalife's marketing plan, the Chairman's Club and Founder's Circle, who are automatically included in the S&P Committee.

- Approximately 20 distributors who are chosen by Herbalife to participate based on some combination of geographic location, downline volume, and downline volume growth.

- Herbalife employees and executives, who participate in, and facilitate, committee meetings but are not technically considered part of the Committee.

54.   The S&P Committee meets online at least once a month and assembles in person at least three times per year — often just prior to large national Circle of Success events.

55.   Each S&P Committee member participates in multiple sub-committees that report back to the central committee. Sub-committees include:

- Events Committee
- Promotion Committee

- STS Committee
- Products Committee
- Budget Committee
- Engagement Committee
- Marketing Plan Committee
- Extravaganza Committee

56.     The S&P Committee operates and controls the Circle of Success event system. These committee members dedicate dozens of hours a month on committee work.

57.     Local leadership teams form their own committees — many dubbed "local S&Ps" by distributors.

58.     Herbalife seeks regional representation when it invites top distributors to participate on the S&P Committee, so most local leadership teams have at least one member currently serving on the central S&P Committee.

59.     Defendants Peterson, Stanford, Waldron, Addy, Morrow, Katz, and Grace participated in an in-person meeting of the S&P committee December 3, 2013, in Boca Raton, Florida. The committee discussed the Circle of Success event calendar for the next year, event qualifications, and income claims that can be made at events.

60.     Defendants Addy, Katz, Holloway, Tartol, Mejia, Rosenau, Morrow, and Riveros participated in the May 12, 2015, online meeting of the Events and Promotion Subcommittee where Circle of Success attendance figures, qualifications, and special promotions were discussed.

61.     Defendants Addy, Katz, Holloway, Sandoval, Mejia, and Rosenau participated in the March 11, 2015, online meeting of the Events and Promotion Subcommittee where Circle of Success event agendas, qualifications, venues, and budgets were discussed and the committee voted to keep January events semi-independent.

62.     Defendants Morrow, Addy, Grace, Wick, Rosenau, Holloway, Waldron, Stanford, and Peterson participated in the June 23, 2016, online meeting of the S&P committee in which Circle of Success ticket sales, qualifications, speaker selection, and the "semi-corporate" nature of the January events were discussed.

63.     Defendants Morrow, Addy, Wick, Holloway, Waldron, Peterson, Rosenau, Riveros, and Sandoval participated in the September 29, 2016, online meeting of the S&P

committee in which Circle of Success event qualifications, ticket sales, agendas, locations, and speakers were discussed.

64.     Defendants Morrow, Addy, Rosenau, Tartol, Holloway, and Waldron participated in the April 21, 2016, online meeting of the S&P committee in which Circle of Success ticket sales, qualifications, and attendance were discussed.

65.     Defendants Addy, Grace, Morrow, Rosenau, Wick, Holloway, and Tartol participated in August 20, 2015, online meeting of the S&P committee in which corporate support for Circle of Success events was discussed and the STS sub-committee reported back with a plan for STS growth and encouraged S&P members to participate in area STS leadership calls.

<u>**Event Content**</u>

66.     Events present distributors basic information about the products and the marketing plan — the same information month after month, year after year. Remarkably little about the core messaging has changed over the past decade.



67.     Event attendees are told that top distributors recruit new business opportunity participants by employing a technique that Herbalife members call "Use, Wear, Talk".

- **Use** the products. Each person must get a product "result" — losing weight, gaining muscle, having more energy, ceasing to take previously prescribed medications, etc. — through the aggressive use of Herbalife's products.

14

- **Wear** the button (or Herbalife branded apparel). The ubiquitous button expresses one of several standard messages, e.g.: "Lose weight now, ask me how", "Make Money Now, Ask Me How", or "Earn What You're Worth".
- **Talk** to people about the products and business opportunity when they ask about your product results or button/branding.

68.     Event attendees are told that "Daily Methods of Operation" ("DMOs") like "Use, Wear, Talk", operating fixed retail locations dubbed "Nutrition Clubs", offering free exercise programs dubbed "Fit Camps", or hosting *The Biggest Loser* style competitions that distributors call "Weight Loss Challenges", are all to be done with the intention of finding new people to feed into the Circle of Success event system.



69.     By the top distributors' own account, approximately 80% of event content is intended as "inspiration" and consists primarily of distributors talking in glowing terms about their own success and the likelihood that that success can be replicated. See Exhibit 3.

70.     An Herbalife Circle of Success event is intended to give the false impression that everyone taking the business opportunity seriously is currently experiencing impressive success.

71.     Over the course of an event dozens of people — members of the audience, panels of speakers, scheduled speakers, featured speakers — take to the stage, and in one context or another, testify to their own success.

72.     The struggle, loss, and embarrassment experienced by the vast majority of Herbalife business opportunity participants is not represented from the stage of any Circle of Success event.

73.     Every single event devotes time to promoting the value of "attending every event". Attending every event is presented as the path to success walked by all the company's leading lights; a "duplicable" pattern that can be utilized by anyone who wants to achieve similar results.



74.     Event speakers specifically and intentionally correlate event attendance with success: the more events a distributor attends, and the more downline members a distributor brings to those events, the more money that distributor will make via the Herbalife marketing plan.



## WHY DOES GETTING PEOPLE TO EVENTS CREATE ROYALTY DUPLICATION?

– Hear Many Stories (opportunity to relate)
– See a bigger picture of Herbalife (not just you)
– More People to Events = More Royalty.

– MY ABILITY TO GROW A ROYALTY CHECK IS COMPLETELY DEPENDENT ON MY ABILITY TO GET PEOPLE TO EVENTS!
– *Why is this?*
  • Leverage Your Time:

5

Confidential                                                    HLF_037340

75.    Top distributors have no reasonable basis from which to claim that event attendance will lead to success.  In fact, they know that their own success has nothing to do with event attendance and nothing to do with the techniques they market at events.

76.    Herbalife requires top distributors and event operators to disclaim the atypical results presented at Circle of Success events by referring attendees to the current version of Herbalife's Statement of Average Gross Compensation ("SAGC"). The document is displayed on screen during certain presentations; is presented in the room at all STS events via a poster-board blow-up of the document; and attendees are referred to a version available on Herbalife's member only website, myherbalife.com.

77.    The SAGC is a complex, constantly changing document that gives an intentionally obscure and misleading impression of an individual's chances of having financial success with Herbalife's business opportunity. In 2016, a Federal Trade Commission complaint against Herbalife alleged that:

> *The Statement of Average Gross Compensation does not provide clarity*
> *or realistic expectations, but instead obfuscates through a dense maze of*
> *verbiage and numbers. Neither the reference to nor the Statement of*

> *Average Gross Compensation itself alters the net impression created by*
> *Defendants' misleading representations.*

*FTC v. Herbalife*, Case No. 2:16-05217 (C.D. Cal., July 15, 2016), ECF No. 1 at ¶ 23.

78.   Top distributors do not participate in the creation of the SAGC, do not understand it, and make regular reference to it without any basis to believe it presents an accurate picture of what's possible with the Herbalife business opportunity.

79.   The SAGC does not disclaim the direct link between event attendance and success constantly drawn during Circle of Success events.

**Event Promotion**

80.   Advertising and promotion of the upcoming Circle of Success event begins with a one-page flier that is distributed and displayed at the current month's Circle of Success event. The flier is posted to leadership-controlled STS websites and on event specific social media pages managed and controlled by that same leadership.

81.   There are more than fifty local leadership-controlled STS websites continuously advertising and selling Circle of Success events. Most of these sites are currently registered behind privacy proxies, but many of the registrations were previously public. For example:

- STSMiami.com was registered to Defendant Jorge de la Concepción
- BostonSTS.com was registered to Defendant John Tartol's brother Jim Tartol
- DallasSTS.com was registered to Defendant Dan Waldron
- OrangeCountySTS.com was registered to Defendant Cody Morrow

82.   The event fliers promoted by the top distributors tell the brief story of a person who was once lost in the normal struggle of human existence that has since been set free from the bondage of work and uncertainty via the "anyone can do this" power of the Herbalife business opportunity:

- Just by recommending the nutrition to my circle of influence and my local community, I was generating over $4000 extra. In January 2013, after another amazing event, I was so blown away by the testimonies that I decided to quit my job and take this business to the next level. [Karim Ali, 2016 Miami STS]
- I quit my internship @ the states attorneys office and decided to ditch law school to pursue the Herbalife business opportunity full time! My first check

18

was $61 and two years later I earn over $7,000 + every single month! [Maigan Graham, 2014 Phoenix STS]

- Lisa Arnold was able to go from a zero dollar income to a 6 figure income in 12 months and she will be sharing in detail exactly how she did so! [Lisa Arnold, 2015 Boston STS]

- They both had great results using the products and when their parttime income reached $5000 a month, Laura quit her job as a banker and Mike left his job in non-profit fundraising... "We are truly living our dreams!" [Mike and Laura Curtis, 2013 Denver STS]

- After doing Herbalife for just 21 months they were able to reach President's Team, along with Jorge's parents!!!!! The most important part is that they are able to stay at home with their kids and spend every moment with them because of the lifestyle they have earned! [Disney & Jorge de la Concepción, 2015 Tampa Bay STS]

- Four months after I signed up I decided to take a leap of faith, so I fired my bosses and put Nursing school on hold for life and it's been the best decision I've ever made. [Ximena Betancourt-Mejia, 2016 Palm Beach STS]

- Within 3 weeks she attended her first STS and that help launch her business to making over $8000 a month within 90 days. [Launa Rasch, 2012 Denver STS]

- In the first 10 weeks Tim made more part-time than he did full time... "I hit a six-figure income in 3 years, and now I earn more per month working the hours I choose around my family than I used to make in one year as a Marine! [Tim Hendricks, 2015 Chicago STS]

- I attended a training just like the success training seminar I will be at with all of you, and loved the positive energy. That day was life changing. I copied what they taught me and put it into action right away, and within a few months was able to go full time with Herbalife. [Karen Feiger-Kolehmainen, 2014 Palm Beach STS]

Attached hereto as Composite Exhibit 4 is a sampling of these STS fliers.

83.    Publication of these intentionally misleading STS fliers to leadership-controlled STS websites is only step one of the promotional process. As part of their "communication

plan," Defendants conspire to promote the STS to their downlines across all channels of modern communication, including but not limited to email, Facebook, Snapchat, Instagram, YouTube, Telegram, Zoom, and WhatsApp.

84.     Defendants expect and encourage their Circle of Success promotional messages to be remixed and echoed across the wires via the social media accounts of event participants. Each event flier published by Defendants generates thousands of clone and remix publications in the months leading up to the event.



85.     For example, the flier for the October 3-5, 2014, LDW in Jacksonville was originally published to Herbalife's various websites. Regional leadership then republished the flier over their event websites and social media feeds.

86.     In the final step, hopeful distributors remixed the flier and passed it along through the wires to their own social networks.



("If you are serious about growing your business and making an impact in
your community YOU WILL BE THERE!!!!")

87.     A February 11, 2011, email advertising the Orange County STS that was sent
to Herbalife distributors in the Southern California area promotes "a day that can change your
life, give you back your dreams, and show you a plan to live the lifestyle you want!" Attendees
would hear from featured speaker Suzanne Morrow who, according to the email, went from
"a dissatisfied Real Estate Broker to a Stay at Home Multi-Millionaire Mom & Wife & World
Wide Leader!"

88.     A September 24, 2012, email advertising the San Fernando Valley STS was
sent to distributors in the area by a member of Defendant John Tartol's downline utilizing a
mass email management service. The email invites distributors to, "Come and hear how John
is building his business today. Get some ideas and strategies that have grown his Herbalife
business to over $100,000.00 a MONTH!"

89.     Top distributors promote Circle of Success events by hosting, and participating,
in large online meetings. A February 17, 2018, email sent by an Herbalife employee and
addressed to the "Southern California Herbalife Family" invites distributors to attend a
February 20, 2018, event promotional Zoom call. The email says that on the call Defendant
Ryan Baker "will share HOW attending this event is impactful to YOUR business and WHY
you should commit to attend".

90.     Top distributors utilize ticket sales and management applications to send Circle of Success email advertisements to previous event attendees. In a June 16, 2018, Eventbrite email sent by the "Herbalife SoCal Leadership" invites distributors to attend the June 23rd STS and learn how a broke personal trainer and his wife (an "overworked" bartender) "have made a 6 figure income for the last 6 years."

91.     A March 16, 2018, Eventbrite email sent by the same leadership group has the subject line: "Would You Like To Know My Secret of How I Went From GET Team to President's Team In Less Than 2 Years?! - Join me 3/17/18". The email promises that featured speaker, and Florida resident, Jennifer Micheli will "reveal her Step-by-Step System". Another promotion emailed by the same group February 3, 2018, has the subject line: "The Fastest Way To Grow Your Business is by Attending EVENTS!"

## Speaker Qualifications

92.     The Circle of Success promotes a fetishized narrative surrounding the incomes of top distributors. These distributors are cast as former dropouts, vagrants, bartenders, flight attendants, nurses, teachers, single mothers, used car salesmen, bus drivers, dental hygienists, and college volleyball players — each of whom has achieved astounding success through Herbalife and through attendance at Circle of Success events.

93.     Top distributors use Circle of Success events to demand that downline distributors continue to actively retail and recruit. But despite billing themselves as essential experts on the subject, very few top distributors are actively retailing and recruiting. Many are simply not capable of making sales or recruiting new participants under the terms of Herbalife's current rules.

94.     Top distributors do not disclose that many of the techniques that they used to build their Herbalife downlines decades ago are now, or always have been, forbidden by Herbalife's rules or the law. Their use of techniques such as marketing plan manipulation, misleading income claims, money laundering, currency arbitrage, internet lead generation, internet auction sites, aggressive direct mail recruiting, fraudulent health claims, classified and craigslist job ads, and pre-opening international markets are never explained to event participants.

95.     Top distributors are not qualified to teach what they purport to be teaching. Event attendees are told that they can "duplicate" a model that has already been successful

for the top distributors, but the true details of how these distributors run their Herbalife businesses are never revealed at Circle of Success events.

96.     Nonetheless, in a training video distributed by Herbalife to event participants, Defendant Amber Wick is shown hosting a panel discussion about succeeding with Herbalife Nutrition Clubs in front of more than ten thousand Herbalife business opportunity participants. Wick introduces Sam and Amy Hendricks, telling the audience that Sam and Amy built their fast-growing Herbalife paycheck by relying on the Circle of Success and by working their business "event, to event, to event." Wick says that, "for every person you get to an event, you can expect your check to go up by a certain amount."

97.     President's Team member Amy Hendricks explains that event promotions should focus on the uniqueness of the featured speaker. "It's all about the story, and promoting the trainer themselves," says Hendricks.

98.     But the top distributors do not provide training on the techniques they actually used to build their Herbalife downlines, and actively create the false impression that they have had success using techniques with which they have had no success.

99.     Top distributors instruct event attendees on the importance of making retail sales through the operation of "Nutrition Clubs," but they omit telling event attendees that the proceeds from retail sales make up an inconsequential portion of the top distributors' own Herbalife remuneration. As discussed in more detail below, to the extent these top distributors achieved success in Herbalife, that success was achieved through means and methods unavailable to event attendees.

100.    Moreover, income claims made by top distributors at Circle of Success events are fraudulent because they are given — with great fanfare — as gross figures, masking the high costs of successfully participating in the Herbalife business opportunity.



101.    Many top distributors operate Herbalife "Nutrition Clubs" out of expensive fixed retail locations and encourage members of their downline to do the same. Top distributors hold themselves out to event attendees as having great economic success with the model and ostensibly offer training on the subject. But these top distributors have failed to profit, or have lost money, through their operation of expensive retail Nutrition Club locations. This is never disclosed to event attendees.

102.    Top distributors who are repeatedly featured as Herbalife experts at Circle of Success events, are, in fact, not successful retailers or recruiters and are instead earning substantial incomes by virtue of the efforts and losses of those positioned below them in the scheme.

### Tickets and Damages

103.    Tickets to Leadership Development Weekends and Extravaganzas are sold by Herbalife. The majority of these "corporate event" tickets are purchased via myherbalife.com and all are nonrefundable.

104.    LDW and Extravaganza tickets are also sold on location during Circle of Success events. Ticket purchasers are given a bracelet or other social signifier to help pressure other event attendees to purchase tickets to future events.

105.     Tickets to corporate sponsored events sold during top distributor-run events can be purchased with cash or by utilizing credit card purchase forms created by Herbalife. Cash collected by top distributors for these ticket purchases are processed through local leadership business entities and then remitted to Herbalife.

106.     Herbalife maintains detailed records of all tickets purchased for corporate sponsored events.

107.     Most tickets for top distributor STS events are sold via websites and through entities operated by local leadership. Some local leadership committees handle the ticket processing directly, but most utilize third-party platforms like Eventbrite or Yapsody to whom they pay a fee for ticket processing.

108.     A detailed record of ticket purchasers is available via these third-party platforms.

109.     Most local leadership committees sell STS event tickets on-site in packs of five or ten tickets. Many of these tickets go unused and help to fund future event production.

110.     Tickets to corporate sponsored events are cross-sold during top distributor sponsored events, and vice versa.

111.     All Circle of Success event tickets are non-refundable.

112.     From 2010 to present, at least 100,000 people have collectively purchased more than $100 million worth of event tickets from the Circle of Success enterprise.

### The Purpose of Events

113.     The true purpose of the Circle of Success event system is not "training", but rather distributor retention.

114.     In an April 19, 2016, email exchange with other members of the S&P Committee, Defendant Mary Holloway explained the parade of testimonials that occurs at events:

> The result stories are the lifeblood of our business. They feed the 'why' Herbalife for the masses. I believe that when they hear and see tons of results they love Herbalife even more and it solidifies why they are with us.

115.     Cindy O'Connell, another S&P Committee member, agreed:

> *The income and product stories are just as impacting and powerful to those who have been in a while, as well as to those who are a first time, big event attenders. It cements belief and conviction, and expands vision.*

116.    The density of income testimonials at Circle of Success events is intended to keep Herbalife business opportunity participants mired in the belief that financial success is right around the next corner.



117.    Event attendees are told that they must "qualify for everything" at events if they want to have success in the business opportunity. "Qualifications" are attained by meeting purchase and recruiting quotas set by Herbalife in conjunction with the S&P Committee.

118.    Qualification quotas are geared toward creating so-called "stretchers"; stretchers are distributors doing more volume over a given period than their past volume history would suggest in order to achieve "VIP" status at events.

<u>**PLAINTIFFS**</u>

**Patricia Rodgers**

119.    Patti attended her first large Herbalife recruiting event on January 22-23, 2011, traveling 140 miles to Herbalife's "January Spectacular" in Orlando. The event featured top distributor Susan Peterson as its keynote speaker.

120.    Defendant Peterson convincingly claimed that the Herbalife business opportunity offered a certain path to financial freedom for anyone willing to invest the time, money, and energy. Patti committed herself to vigorously pursuing the Herbalife business opportunity.

121.    Ms. Rodgers attended another Circle of Success event July 8–10, 2011, in Jacksonville. That weekend, Defendant Amber Wick gave a version of her standard Herbalife testimonial. She claimed that she had spent many long years with a stagnant Herbalife business. Wick explained that once she started working her business by funneling prospects into the "Circle of Success," everything changed. Wick claimed she was now living a life of total financial freedom and empowerment, and that anyone willing to "duplicate" her model was sure to achieve the same liberation.

122.    Over the next few years Ms. Rodgers — like thousands of other class members similarly situated — was convinced by an onslaught of guarantees that if she modeled the methods of leaders like Defendants Wick, Addy, Peterson, Tartol, Stanford, and Rosenau, and worked her Herbalife business "event to event," lasting success was the certain outcome.

123.    Ms. Rodgers rarely missed another event for the duration of her four-year involvement with Herbalife; attending more than fifty events, sometimes at a rate of two a week, and doing everything President's Team members told her was necessary to achieve financial independence. Even though she was losing money every month, Ms. Rodgers continued to attend monthly Herbalife events where she was exhorted to double down her efforts with the guarantee that the pot of gold at the end of the rainbow was just within reach.

124.    Ms. Rodgers was so convinced that her formulaic participation in the Herbalife Circle of Success would eventually pay dividends that she moved to Miami from Jacksonville at the urging of one of Herbalife's top distributors.

125.    In her pursuit of the Herbalife business, Patti cashed out a retirement account and a settlement annuity, sold jewelry, moved into shared housing, and borrowed money from family members on more than one occasion.

126.    The constant promotion of the next big event, each promising to be the key to success; and her constant attendance of those highly charged emotional events, kept Ms. Rodgers' false hopes at a steady boil.

127.   Ms. Rodgers attended almost every event from 2011 – 2015. During these events, she heard each of Defendants Wick, Addy, Peterson, Waldron, Stanford, Tartol, and Rosenau make the same misrepresentations: remain dedicated to the Circle of Success, and you will become rich like us.

128.   Yet religious adherence to the Circle of Success did not lead to financial success for Ms. Rodgers. She didn't quit Herbalife; after years of fruitless toil, she simply ran out of money to lose.

129.   Not accounting for her time, Ms. Rodgers and her husband (now deceased) lost more than $100,000 pursuing Herbalife's fraudulent and illusory business opportunity. At least $20,000 of those losses stem directly from her participation in the Circle of Success event cycle.

### Cody Pyle

130.   Cody Pyle attended his first Circle of Success event November 15, 2014, in Norman, Oklahoma.

131.   The November 2014 STS in Norman featured guest speaker Samantha Clayton, a former Olympic athlete and employee of Defendant Herbalife. The event also featured dozens of testimonials and distributors were continually reminded that attending events was the key to achieving success.

132.   By November 2016, after two years under continuous pressure to "attend every event," Cody Pyle had attended twenty-six Circle of Success events, as detailed below.

| Event | Date | Location | Speakers |
|---|---|---|---|
| STS | November 15, 2014 | Norman, OK | Samantha Clayton |
| Kickoff | January 24 – 25, 2015 | Dallas | Various |
| STS | February 21, 2015 | Oklahoma City | Hermes Jones-Parra |
| STS | March 21, 2015 | Oklahoma City | Brad Harris |
| LDW | April 10 – 11, 2015 | Dallas | Dennis Dowdell Laura Holloway |
| STS | May 16, 2015 | Oklahoma City | Maurice & Sandra Smith |
| STS | June 20, 2015 | Oklahoma City | Dan Waldron |
| STS | August 15, 2015 | Oklahoma City | John Heiss |
| LDW | October 10, 2015 | Dallas | Juan Mendoza |
| STS | November 14, 2015 | Oklahoma City | Caley Carroll |

| STS | December 12, 2015 | Oklahoma City | Matt Rushbrook |
|---|---|---|---|
| Kickoff | January 16, 2016 | Oklahoma City | Sheriff Taiwo |
| STS | February 20, 2016 | Oklahoma City | JJ Makowski |
| STS | March 26, 2016 | Oklahoma City | Keyon Owens |
| LDW | April 10, 2016 | Dallas | Garrain Jones, Enrique Carrillo Amber Wick |
| STS | May 15, 2016 | Oklahoma City | Geri & Diego Gutierrez |
| STS | June 25, 2016 | Oklahoma City | Nicole Lakin |
| Extravaganza | July 8 – 10, 2016 | Long Beach | Various |
| STS | August 13, 2016 | Oklahoma City | Khalil Blakey |
| STS | September 10, 2016 | Oklahoma City | Larry & Heather Hulsey |
| LDW | October 22 – 23, 2016 | Dallas | Alexis Pelfrey, Zac Tartol |
| STS | November 12, 2016 | Oklahoma City | Celeste Richmond |

133.    Diligent attendance at every event was not delivering any success for Cody Pyle. And at each of these events, speaker after speaker touted the necessity of qualifying "VIP" for events if one truly wanted to have life changing success with the Herbalife business opportunity. Attendees were told that there would be a direct correlation between VIP qualifications and the size of their Herbalife paychecks.

134.    Over Cody's two-year involvement with Herbalife he averaged 2451 in personally purchased volume points per month. But for three consecutive months beginning February 2016, Mr. Pyle purchased almost triple that amount of volume in a conscious effort to "qualify for everything" at events as per instructed.



| Month | Personally Purchased Volume |
|---|---|
| 2016/12 | 418.75 |
| 2016/11 | 1,791.90 |
| 2016/10 | 3,107.11 |
| 2016/09 | 1,787.82 |
| 2016/08 | 2,367.05 |
| 2016/07 | 1,930.27 |
| 2016/06 | 3,879.52 |
| 2016/05 | 3,787.24 |
| 2016/04 | 6,021.71 |
| 2016/03 | 6,552.56 |
| 2016/02 | 6,456.76 |
| 2016/01 | 2,828.17 |
| 2015/12 | 878.40 |
| 2015/11 | 1,422.46 |
| 2015/10 | 2,728.55 |
| 2015/09 | 1,548.92 |
| 2015/08 | 2,924.62 |
| 2015/07 | 1,296.85 |
| 2015/06 | 1,230.75 |
| 2015/05 | 615.77 |
| 2015/04 | 1,228.05 |
| 2015/03 | 1,478.95 |
| 2015/02 | 1,078 |
| 2015/01 | 1,465.57 |
| 2014/12 | 592.05 |

135.     But Circle of Success VIP qualification, like regular event attendance, did nothing to help Cody succeed at the Herbalife business opportunity.

136.     Cody lost approximately $30,000 pursuing Herbalife's fraudulent and illusory business opportunity. $11,600 of those losses can be directly attributed to his travel to, and attendance of, Circle of Success events.

### Izaar and Felix Valdez

137.     Izaar Valdez and her father, Felix Valdez, have spent almost a decade trying to achieve the success promised by Herbalife's President's Team members from Circle of Success stages across the country.

138.     From the stage of a 2008 Herbalife STS in Miami, Izaar and Felix were told that they would be making $500,000 per year in Herbalife, that they would be able to purchase homes using all cash, and that their family's future would be secure for generations.

139.     Izaar and Felix are U.S. citizens who immigrated to Miami from the Dominican Republic. Felix lives in Miami and has been operating his own construction company here since 1993. Tens of thousands of hard-earned dollars were drained from Mr. Valdez's real business and sunk into Herbalife's illusory business.

140.    Izaar Valdez is an administrative assistant who has worked the Herbalife business opportunity in both Miami, Florida and Elizabeth, New Jersey. She is currently a resident of Miami.

141.    Izaar and Felix were in the downline organization of top distributors Guillermo and Claudia Rasch. Like many others in Herbalife's Latino market, Felix and Izaar were instructed by their upline to participate in continuous "training systems." The systems had the Valdezes attending tri-weekly events costing up to $200 per month.

142.    At the tri-weekly events and the monthly Circle of Success events, distributors were continually reminded that event attendance was crucial to achieving success in Herbalife.

143.    Izaar and Felix attended dozens of Circle of Success events. They paid cash to top distributors for those events.

144.    Twelve thousand people, including Ms. Valdez, attended Herbalife's Extravaganza Latina in Atlantic City, New Jersey October 16–19, 2014. Defendants collectively produce Spanish language Circle of Success events that run in parallel to English events in cities with dense populations of new immigrants.

145.    Izaar lost more than $3,500 attending Circle of Success events in 2014. That same year, while working her business from dawn to dusk, she spent more than $10,000 purchasing Herbalife products in order to "qualify for events" and move up in the Herbalife marketing plan.

146.    Izaar's husband left her and her three children in desperation over her continuous Herbalife losses. When she sought advice from her top distributor "mentors" about the collapse of her family, she was told to stay the course, to continue to make the necessary purchases, and to attend all the necessary events — this was no time to give up.

### Jennifer Ribalta

147.    Ms. Ribalta was recruited into Herbalife's business opportunity directly by top distributor Tommy Gioiosa. Mr. Gioiosa, who was managing a strip club at the time, was a frequent customer of the photo/printing shop where Ms. Ribalta was employed. She was convinced by Mr. Gioiosa to sign up for Herbalife, and to attend her first Circle of Success event in February of 2011.

148.    At that event, like every other Circle of Success event, presenters emphasized the importance of attending Circle of Success events every month in order to guarantee success as an Herbalife distributor.

149.    Ms. Ribalta was drafted into the event "Production Team" by top distributor Sandy Gioiosa. Production Team duties require an average of eight hours unpaid labor per event and often mean an extra night away from home. But working long hours on the event does not free you from your obligation to pay for the event. Ms. Ribalta usually paid for Circle of Success events by giving cash directly to Mr. Gioiosa.

150.    In her first year, Jen attended events in Daytona Beach, Jacksonville, Orlando, and Las Vegas. She was also expected to attend smaller weekly recruiting meetings held at the Gioiosa's Nutrition Club, where she was paying $100 per month for the right to work behind the counter uncompensated.

151.    On September 26, 2012, Sandy Gioiosa hosted a call to promote the upcoming Extravaganza to members of her downline. Defendants Amber Wick and Dani Grace were presented as "special guests" and were introduced as two of the company's fastest growing, top earning, distributors.

152.    On that call, Grace states that Extravaganza attendance has "completely transformed" her life, allowing her to build up what she called "legacy" wealth in just five years. She says she knows many people are "putting together every single penny that they have," to be able to attend the event. She claims it will be worth overcoming any "excuse" not to attend, including: insufficient funds, an unsupportive spouse, a job, or the need to take care of children. Whatever a person's financial or emotional position, Grace claims that, "it is vital that you do whatever you have to do to get to this event."

153.    Both Wick and Grace describe finding a way to attend Extravaganza at a time when they certainly could not afford to attend, and the massive life changing success that resulted from that reckless decision. If you want the health, the wealth, the lifestyle — even the ability to help those in need — then you must attend the Circle of Success events. "You can't help the poor if you are one of them," say both Grace and Wick during the hour-long pitch.

154.    Ms. Ribalta attended the 2012 Extravaganza in Long Beach the following month as instructed, and she attended the 2013 Extravaganza in Las Vegas. In between, she

attended local and regional events across Florida. In fact, Jen Ribalta attended a Circle of Success event every month for 40 consecutive months, "volunteering" to work Production Team at thirty of those events. The tables below show the dates, locations, and Featured Speakers at the events Ms. Ribalta attended.

| Date / Year | Event Type | Location | Speaker |
|---|---|---|---|
| Feb-11 | STS | Daytona Beach | Meg Lyle |
| Mar-11 | Did Not Attend | | |
| Apr-11 | LDW | Jacksonville | Debbie Combs |
| May-11 | STS | Daytona Beach | Laura McClure |
| Jun-11 | African American Recruiting Tour | Orlando | Enrique Carillo |
| Jul-11 | LDW | Jacksonville | Laura Meister Brad Harris |
| Aug-11 | STS | Daytona Beach | Sam Hendricks |
| Sep-11 | STS | Daytona Beach | Graeme Edwards Ron Rosenau |
| Oct-11 | Extravaganza | Las Vegas | N/A |
| Nov-11 | STS | Ormond Beach | DJ Humphries |
| Dec-11 | STS | Daytona Beach | Roxanne Chauvanne Daytona |
| Jan-12 | Spectacular | Jacksonville | Kurt O'Connell  (Amber & Jason Wick?) |
| Feb-12 | STS | Daytona Beach | Jack Gibson |
| Mar-12 | STS | Daytona Beach | Alexis Pelfrey |
| Apr-12 | LDW | Jacksonville | David Hayes Michael Burton |
| May-12 | STS | Daytona Beach | John & Bobby Franchetti |
| Jun-12 | STS | Daytona Beach | Dr. John Heiss |
| Jul-12 | LDW | Jacksonville | Enrique Carillo Jason Wick |
| Aug-12 | STS | Daytona Beach | Trey Herron |
| Sep-12 | STS | Daytona Beach | Tommy & Sandy (?) |
| Oct-12 | Extravaganza | Long Beach CA | N/A |
| Nov-12 | STS | Lake Mary | Tommy Gioiosa Mark Davis |
| Nov-12 | Chairman's Club Event | Orlando | Dan Waldron |
| Dec-12 | STS | Lake Mary | David Hayes |

| Date / Year | Event Type | Location | Speaker |
|---|---|---|---|
| Jan-13 | Spectacular | Orlando | Dani Edwards |
| Feb-13 | STS | Lake Mary | Zach Tartol |
| Mar-13 | STS | Lake Mary | Alcides Mejia |
| Apr-13 | LDW | Jacksonville | Sam & Amy Hendricks |
| May-13 | STS | Tampa | Nestor Villageliu |
| Jun-13 | STS | Lake Mary | Local Leadership |
| Jul-13 | LDW | Jacksonville | Craig & Caroline Tsutakawa |
| Aug-13 | STS | Altamonte | Kevin & Laurie Gross and Mona Shultz |
| Sep-13 | STS | Lake Mary | |
| Oct-13 | Extravaganza | Las Vegas | |
| Nov-13 | STS | Altamonte | Body Transformation Challenge |
| Dec-13 | STS | Lake Mary | Sandra and Maurice Smith |
| Jan-14 | Spectacular | Orlando | Alexis Pelfrey Jack Gibson |
| Feb-14 | STS | Lake Mary | Kim Muniz |
| Mar-14 | STS | Tampa | |
| Apr-14 | LDW | Daytona Beach | Mike Patterson |
| May-14 | STS | Lake Mary | Jake Holloway |
| Jun-14 | STS | Lake Mary | Local Leadership |
| Jul-14 | Extravaganza | Chicago | |

155.    Over the course of her involvement with Herbalife, Ms. Ribalta spent more than $10,000 attending Circle of Success events.

## Joanna Kirby

156.    Joanna Kirby's online application to become an Herbalife distributor was filled out and submitted by her sponsor on September 6, 2009. She wanted to lose weight; she was being pitched on the business opportunity; her parents paid for her initial membership as a gift.

157.    Ms. Kirby took detailed notes throughout her Herbalife experience. At her first meeting she was instructed to write down her goals:

> Lose 20 lbs
> Help others get healthy
> $1500 per month
> Be available to focus on school
> pay off credit cards, student loans
> pay for school

158.    By January 30, 2010, she was attending her first event. She traveled from St. George, Utah, to Las Vegas, Nevada, to attend the six-hour Success Training Seminar. The first time was free.

159.    Almost immediately Ms. Kirby was being told that attending events was the secret to success. "How many people do we have coming today? How can I get 5 more next time? Build the City! Use the meeting to do the work." She wrote.

> Choose to live in the Herbalife reality.
> Participate + attend all trainings + events
> Qualify for Leadership Development Weekend in April
> Herbalife is going to $5 billion — how much of the pie do I
> want?

160.    At the end of the event, as at all Circle of Success events, the speaker gave a hard pitch for upcoming events. Ms. Kirby's final note from her first event reads: "Pay any price to stay in the presence of extraordinary people."

April Training. 16th-18th
· Orange County
· Fully Qualified Supervisor
   -2500.vp
· Herbalifeevents.com

161.    Ms. Kirby attended the April 16-18, 2010, Orange County LDW as instructed. She brought a guest as instructed. She remained "coachable" as instructed.

162.    Ms. Kirby "attended every event" for nearly six straight years, last purchasing a ticket for an LDW in October 2016: she handed out invites, she worked at a nutrition club, she used the products, she wore the button, she talked to anyone who would talk — but the success never came.

163.    Defendant Amber Wick tells event participants that she spent five years trapped at the lower rungs of the Herbalife scheme — so she knows how it feels — but that she ultimately made it to the top by not giving up and by increasing her commitment to the event system. Like many others, Ms. Kirby found Ms. Wick's testimonial convincing, inspiring, and encouraging — she made her own plans to persevere.

164.    After spending a few years entwined in the event system, Ms. Kirby found most of her real-life connections had been replaced by Herbalife connections. Eliminating skeptics,

doubters, and "dream stealers" is a subtle — and not so subtle — message that is consistently delivered at Circle of Success events.

165.    For example, at the July 2015, Extravaganza in St. Louis, Missouri, (which Ms. Kirby attended) Defendant Susan Peterson — Herbalife's most venerated distributor — told the large audience of participants that they may need to "prune the vine of some relationships."

> *Sometimes what holds you down from your destiny is who you're hanging out with. Your destiny is too great. You need to find some new friends and I would just suggest y'all look around — these are my friends — these are good friends. These are the kind of friends you want to know. You wanna know people who are likeminded. This is another reason to always come to the meeting — so you see your friends.*

166.    Top distributors use events to keep victims vulnerable to their deceptions — encouraging event participants to inhabit an isolated and insular world where all doubt is eliminated.

167.    Ms. Kirby lost more than $50,000 — and six years of her life — to the pursuit of the Herbalife business opportunity. At least $7,000 of those damages stem directly from purchasing tickets for, and traveling to, Circle of Success events across the country.

### DEFENDANTS

168.    Each of the Defendants has been a part of the S&P Committee. Each Defendant has been a featured speaker at multiple events. Each Defendant has used the wires to promote events. The specific acts delineated below are merely exemplars of the Defendants' continuous and continuing participation in the scheme outlined above.

169.    **Defendants Mark and Jill Addy** are residents of Colorado and are two of Herbalife's top distributors. The Addys are members of the S&P Committee and have served on various sub-committees including the Events and Promotion Committee.

170.    The Addys participated in online S&P meetings March 11, 2015; May 12, 2015; August 20, 2015; June 23, 2016; September 29, 2016; April 21, 2016; and participated in an in-person meeting in Boca Raton, Florida, December 3, 2013; each as detailed above.

171.   February 27, 2012, the Addys were the featured speakers on a nationwide call organized for all distributors by Herbalife to promote riding the "momentum of the Herbalife STS wave" and sharing "STS secrets to success".

172.   The Addys were two of the primary organizers of STS events taking place in the Southern California region during the relevant period.

173.   Jill Addy was the featured speaker at the October 14-16, 2016 Minneapolis LDW; the October 13-15, 2017, Dallas LDW; and the April 12-14, 2014 Boston LDW where she misled the audience regarding the import of event attendance.

174.   Mark Addy was the featured speaker at July 20-22, 2012, Detroit LDW and the October 26, 2019, Detroit LDW where he misled the audience regarding the import of event attendance.

175.   **Defendants Jorge de la Concepción and Disney di Martinez** are residents of Miami, Florida, and operate their Herbalife business as a couple. The Concepción Defendants are the fastest growing distributors in the history of the company and serve as members of the S&P Committee. Following up on a June 22, 2017, online meeting of the committee, the De la Concepcións participated in a July 14, 2017, in person committee meeting to decide how LDW qualifications would change in response to the FTC consent order.

176.   Mr. de la Concepción was previously the primary organizer of the very large Miami STS.

177.   Mr. de la Concepción was the featured speaker at the October 14-16, 2016, Fort Lauderdale LDW; at the January 15-16, 2017, at the Phoenix January Kickoff; and August 21, 2016, New York STS; where he misrepresented the import of event attendance.

178.   The couple were the featured speakers at the February 15, 2014, Orlando STS; at the December 19, 2015, Tampa Bay STS; at the November 7, 2015, Palm Beach STS; at the October 25, 2014, Miami STS; at the May 18, 2014, Chicago STS; where they misrepresented the import of event attendance.

179.   The couple promoted each of the above event speaking engagements using their popular social media profiles.

180.   **Defendant Susan Peterson** is a resident of Houston, Texas, and is one of Herbalife's top distributors. In most recent years Peterson has ranked as Herbalife's top earning distributor. Ms. Peterson serves on the S&P Committee and various sub-committees.

181. Peterson participated in online S&P meetings September 29, 2016; June 23, 2016; and participated in an in-person meeting in Boca Raton, Florida, December 3-4, 2013; each as detailed above.

182. Ms. Peterson was the featured speaker at the April 12-14, 2013, Dallas LDW; at the December 10, 2016, Denver STS; at the October 9-11, 2015, Las Cruces LDW; at the January 22-23, 2011, Orlando Spectacular; at the October 21-23, 2016, Dallas LDW; at which she misled large audiences on the correlation between event attendance and financial success.

183. **Defendant Amber Wick** is a resident of Destin, Florida, and is one of Herbalife's top distributors. Wick serves on the S&P Committee and various sub-committees.

184. Wick participated in online S&P Committee meetings August 20, 2015; June 23, 2016; and September 29, 2016; as described above.

185. Wick was the featured speaker at the July 12-14, 2013 Minneapolis LDW; at the October 24-26, 2014, Orange County LDW; at the April 8-10, 2016, Dallas LDW; and at the November 19, 2016, Orlando STS; where she misled audiences regarding the Herbalife business opportunity and the correlation between event attendance and success.

186. October 29, 2012, Wick was the featured speaker on a nationwide call organized for all distributors by Herbalife to promote Circle of Success events and "riding the wave" from Extravaganza "through your next 90 days" utilizing the "Herbalife STS Wave!"

187. **Defendant Dan Waldron** is a resident of Plano, Texas, and is one of Herbalife's top distributors. Waldron serves on the S&P Committee and has served on various sub-committees including the Events and Promotion Committee.

188. Waldron participated in online S&P Committee meetings June 23, 2016; September 29, 2016; and April 21, 2016; and in an in-person meeting in Boca Raton, Florida, December 3, 2013; as described above.

189. Waldron was the featured speaker at the April 13-15, 2012, Orange County LDW; at the January 26-27, 2013, Kansas City Spectacular; at the April 8-10, 2016, Orlando LDW; at the February 10, 2018, Dallas STS; at the April 12-14, 2019, Minneapolis LDW; and at the October 18-20, 2019, Orlando LDW; where he misrepresented the importance of event attendance.

190.    March 26, 2012, Waldron was a guest speaker on a nationwide call organized for all distributors by Herbalife to promote riding the "momentum of the Herbalife STS wave" and sharing "STS secrets to success".

191.    **Defendant Leslie Stanford** is a resident of Englewood, Colorado, and is one of Herbalife's top distributors. Stanford is a member of the S&P Committee and various sub-committees including the Budget Committee.

192.    Stanford participated in an online S&P Committee meeting June 23, 2016; and in an in-person meeting in Boca Raton, Florida, December 3, 2013; as detailed above. January 8-9, 2020, Stanford attended in person meetings of the S&P Committee held in Marco Island, Florida.

193.    Stanford was the featured speaker at the April 19-21, 2013, Orange County LDW; at the October 10-12, 2014, Dallas LDW; at the October 21-23, 2016, Detroit LDW, and at the April 19-21, 2019, Orlando LDW; where she misled audiences regarding the Herbalife business opportunity and correlation between event attendance and success.

194.    **Defendant John Tartol** is a resident of Malibu, California and is one of Herbalife's top distributors. Mr. Tartol is a long-time member of Herbalife's board of directors and serves on the S&P Committee and various sub-committees including the Events and Promotions Committee.

195.    Tartol participated in online committee meetings on May 12, 2015; April 21, 2016; and August 20, 2015; as detailed above. January 8-9, 2020, Tartol participated in an in-person meeting of the S&P Committee held in Marco Island, Florida.

196.    Tartol was the featured speaker at the January 11-12, 2014, Dallas Spectacular; at the September 29, 2012 San Fernando Valley STS; where he misrepresented the importance of event attendance.

197.    July 12, 2015, Tartol closed out the 35th Anniversary Extravaganza in front of the more than 25,000 distributors who had assembled in St. Louis, Missouri. Tartol gave the "Last 5 Minutes" section emphasizing the importance of attending, and qualifying for, upcoming events.

198.    **Defendant Alan Rodriguez** is a resident of Miami, Florida, and is one of Herbalife's top distributors. He operates his Herbalife business in conjunction with his wife, Fabiola Barinas. Rodriguez serves on Herbalife's S&P Committee, and on the Event Agenda

& Promotions Sub-Committee. He participated in an online meeting of this committee facilitated by Herbalife, September 18, 2019.

199.    Rodriguez is one of the primary organizers of the Miami STS, an event that averages more than 500 participants per month.

200.    Rodriguez was the featured speaker at the February 7, 2016, Palm Beach STS; and at the October 12-14, 2018, Dallas LDW; where he misstated the importance of event attendance.

201.    Rodriguez was the primary coordinator of the July 26-28, 2019, Extravaganza in New Orleans, Louisiana. He also served as a guest speaker at the event.

202.    Rodriguez was the emcee of the April 25, 2015, Miami LDW, where he pitched the critical necessity of attending Circle of Success events from the stage throughout the day.

203.    **Defendant Michael Katz** operates his Herbalife business with his wife Debi from Leeds, Utah, and is one of Herbalife's top distributors. Katz has been a member of the S&P Committee and helps organize STS events in the Utah and Arizona areas.

204.    Katz has served on the Events and Promotions subcommittee and participated in online meetings for that committee March 11, 2015; and May 12, 2015; on December 3, 2013, Katz participated in an in-person S&P meeting in Boca Raton, Florida; each as described above.

205.    Katz was the featured speaker at the April 24-26, 2015, Miami LDW, where he misled event participants about the utility of "attending every event". Katz participated in a call to coordinate that event with local Florida leadership on March 27, 2015.

206.    Katz was the featured speaker at the October 10-12, 2014 Philadelphia LDW. At that event he misrepresented the importance of event attendance, including while giving the closing sixty-minute presentation focusing exclusively on Circle of Success events.

207.    Katz was the featured speaker in a nationwide teleconference promoting the importance of the STS hosted by Herbalife on November 7, 2011. The call was advertised to tens of thousands of people.

208.    **Defendants Cody and Suzanne Morrow** are residents of Fort Worth, Texas, and are two of Herbalife's top distributors. They have served on the S&P Committee and various sub-committees including the STS Committee. For most of the relevant period the Morrows organized STS events in Southern California.

209.    The Morrows participated in online S&P Committee meetings August 20, 2015; April 21, 2016; September 29, 2016; June 23, 2016; and participated in an in-person meeting in Boca Raton, December 3, 2013; each as detailed above.

210.    Suzanne Morrow was the featured speaker at the February 12, 2011, Los Angeles STS and promoted that appearance via email February 11, 2011. Ms. Morrow was the featured speaker at the Costa Mesa STS November 2, 2013; the flier — which was posted online and over social media — advertised her as "making millions" while raising her children.

211.    Cody Morrow was a guest speaker at the December 4-6, 2013, Future President's Team Retreat in Boca Raton, Florida, where he presented on the centrality of the STS to the Herbalife business opportunity. See Exhibit 3.

212.    **Defendant Ryan Baker** is a resident of Zanesville, Ohio, and is one of Herbalife's top distributors. Baker serves on the S&P Committee.

213.    Baker is one of the primary organizers of the STS in Columbus, Ohio.

214.    Baker was a guest speaker at the Future President's Team Retreat in Marco Island, Florida, January 10-12, 2020.

215.    Baker was the featured speaker at the April 28-29, 2018, Los Angeles LDW. He promoted the event to other distributors via a Zoom conference facilitated by Herbalife on February 20, 2018.

216.    Baker was a guest speaker at the April 2016, LDW in Detroit. At that event he presented forty-five minutes of misleading success testimonials. Baker was the featured speaker at the September 9, 2017, Daytona Beach STS, where he misrepresented the import of event attendance.

217.    **Defendant Danielle Grace** is a resident of Miami, Florida and is one of Herbalife's top distributors. Grace serves on the S&P committee. She participated in online committee meetings June 23, 2016, August 20, 2015; and participated in an in-person meeting in Boca Raton, December 3, 2013; each as detailed above.

218.    Danielle Grace was one of the primary organizers of the Circle of Success events held in the New Mexico area during a portion of the relevant period.

219.    Defendant Grace was a guest speaker at the Extravaganza in Atlanta, Georgia, on July 23, 2016. Ms. Grace presented the large audience of distributors with forty minutes worth of misleading success testimonial accompanied by color themed confetti.

220.    March 26, 2012, Grace was a guest speaker on a nationwide call organized for all distributors by Herbalife to promote riding the "momentum of the Herbalife STS wave" and "STS secrets to success".

221.    **Defendant Mary Holloway** is a resident of Plano, Texas and is one of Herbalife's top distributors. Holloway serves on the S&P Committee and on various sub-committees including the Event and Promotions Committee and the STS Committee.

222.    Holloway participated in online S&P Committee meetings March 11, 2015; May 12, 2015; August 20, 2015; June 23, 2016; April 21, 2016; September 29, 2016; as described above. January 8-9, 2020, Holloway attended in person meetings of the S&P Committee held in Marco Island, Florida.

223.    Holloway was the featured speaker at the July 12-14, 2013, Philadelphia LDW; at the March 15, 2014, Dallas STS; and at the October 2-4, 2015, Orange County LDW; where she misrepresented the importance of event attendance.

224.    **Defendant Gabriel Sandoval** is a resident of Nipomo, California, and is one of Herbalife's top distributors. Sandoval is a member of the S&P Committee and participates in various sub-committees including the Events and Promotion Committee.

225.    Sandoval participated in an online meeting of the Events and Promotion Committee March 11, 2015, as described above.

226.    Following up on a June 22, 2017, online meeting of the committee, Sandoval participated in a July 14, 2017, in person committee meeting to decide how LDW qualifications would change in response to the FTC consent order.

227.    Sandoval is the primary organizer of a large STS event in Santa Clara, California.

228.    Sandoval was the featured speaker at the June 21-23, 2013, Atlantic City LDW; at the January 16-17, 2016, Dallas Kickoff; and at the January 23-24, 2016, New York Kickoff; at which he misled large audiences on the correlation between event attendance and financial success.

229.   **Defendant Alcides Mejia Jr**. is a resident of Miami, Florida, and is one of Herbalife's top distributors. Mejia is a member of the S&P Committee and participates in various sub-committees including the STS Committee.

230.   Following up on a June 22, 2017, online meeting of the committee, Mejia participated in a July 14, 2017, in person committee meeting to decide how LDW qualifications would change in response to the FTC consent order. Mejia participated in online committee meetings March 11, 2015, and May 12, 2015, as detailed above.

231.   Mejia Jr. is one of the primary organizers of South Florida Circle of Success events.

232.   Alcides Mejia Jr. was the featured speaker at the February 25-26, 2014, Orlando STS; at the October 2-4, 2015, Orange County LDW; at the January 17, 2015, Denver Kickoff; at the July 2, 2016, Palm Beach STS; at the September 17, 2016, Miami STS; and at the October 28-30, 2016, Long Beach LDW; where he misrepresented the importance of events and the likelihood of experiencing life changing success with the Herbalife business opportunity.

233.   **Defendant Carol Rosenau** is a resident of Miami, Florida, operates her business in conjunction with her husband Ron Rosenau, and is one of Herbalife's top distributors. Rosenau has been a member of the S&P Committee and various sub-committees including the Events and Promotion Committee.

234.   Rosenau participated in online committee meetings March 11, 2015; May 12, 2015; June 23, 2016, April 21, 2016; and September 29, 2016; each as detailed above.

235.   Carol Rosenau was the featured speaker at the April 19-21, 2013, Minneapolis LDW; at the November 9, 2013, Miami STS; and at the December 17, 2016, Palm Beach STS; where she misrepresented the correlation between event attendance and business opportunity success.

236.   **Defendant Paulina Riveros** is a resident of Miami, Florida, and is one of Herbalife's top distributors. Riveros is a member of the S&P Committee and participates in various sub-committees including the Engagement Committee and the Events and Promotion Committee.

237.   Riveros participated in online meetings of the S&P Committee May 12, 2015, and September 29, 2016, as detailed above. Following up on a June 22, 2017, online meeting

of the committee, Riveros participated in a July 14, 2017, in person committee meeting to decide how LDW qualifications would change in response to the FTC consent order.

238.    Riveros was the featured speaker at the June 21-23, 2013, Anaheim LDW; and at the December 11-12, 2015, Fort Lauderdale STS; where she misrepresented the correlation between event attendance and business opportunity success.

## CLASS ALLEGATIONS

239.    This action is brought by Plaintiffs as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2) and (b)(3).  Excluded from the Class are all past and present members of Herbalife's President's Team (including members of the "Chairman's Club" and "Founder's Circle"), their employees, proxies, and family members.

### Class Definitions

240.    **THE NATIONWIDE CLASS:** Plaintiffs seek relief under 18 U.S.C. § 1962, the Florida Deceptive and Unfair Trade Practices Act, and for intentional misrepresentation, negligent misrepresentation, civil conspiracy, and unjust enrichment on behalf of themselves and a nationwide class (the "Nationwide Class") defined as:

> *All persons who purchased tickets to, and attended, at least two Circle of Success events from 2010 until present, in pursuit of Herbalife's business opportunity.*

241.    **THE FLORIDA SUBCLASS:** Plaintiffs Jennifer Ribalta, Patricia Rodgers, Izaar Valdez, and Felix Valdez seek relief under the Florida Deceptive and Unfair Trade Practices Act on behalf of themselves and a Florida Subclass (the "Florida Subclass") defined as:

> *All residents of the State of Florida who purchased tickets to, and attended, at least three Circle of Success events from 2010 until present, in pursuit of Herbalife's business opportunity.*

242.    **THE ARIZONA SUBCLASS:** Plaintiff Joanna Kirby seeks relief under the Arizona Consumer Fraud Act on behalf of herself and an Arizona Subclass (the "Arizona Subclass") defined as:

> *All residents of the State of Arizona who purchased tickets to, and attended, at least three Circle of Success events from 2010 until present, in pursuit of Herbalife's business opportunity.*

243.    **THE OKLAHOMA SUBCLASS:** Plaintiff Cody Pyle seeks relief under the Oklahoma Consumer Protection Act on behalf of himself and an Oklahoma Subclass (the "Oklahoma Subclass") defined as:

> *All residents of the State of Oklahoma who purchased tickets to, and*
> *attended, at least three Circle of Success events from 2010 until present,*
> *in pursuit of Herbalife's business opportunity.*

244.    The Nationwide Class, Florida Subclass, Arizona Subclass, and Oklahoma Subclass shall hereinafter be referred to as the "Classes."

245.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before or after the Court determines whether such certification is appropriate as discovery progresses.

**Numerosity**

246.    The members of the prospective Classes are so numerous that joinder of all Class members in a single action would be impracticable. There are more than 100,000 potential Class members who can be readily identified through the records of Herbalife and the Defendants.

**Commonality/Predominance**

247.    There are substantial questions of law and fact common to all potential Class members. Defendants' operation of the Circle of Success scheme is directed and implemented in the same or similar manner toward all potential members of the nationwide Class. These common questions include but are not limited to:

1)  Whether Defendants committed wire fraud by implementing, facilitating, promoting, and participating in the Circle of Success enterprise using the common methods described herein;

2)   Whether wire fraud committed by Defendants constitutes a pattern of racketeering activity;

3)  The extent to which the Defendants exerted mutual control over the alleged racketeering enterprise;

4)  Whether Defendants engaged in a conspiracy to commit wire fraud through the Circle of Success enterprise using the common methods described herein;

5) Whether Defendants' conduct constitutes an unlawful, unfair or fraudulent business practice under Florida law;

6) Whether Defendants' conduct constitutes an unlawful, unfair or fraudulent business practice under Arizona law;

7) Whether Defendants' conduct constitutes an unlawful, unfair or fraudulent business practice under Oklahoma law;

8) Whether Defendants failed to disclose that top distributors built their downlines using unauthorized methods;

9) Whether Defendants failed to disclose the true methods that they employed to build their downlines;

10) Whether Defendants failed to disclose the high cost of active participation in the Herbalife business opportunity;

11) The extent to which Defendants intentionally misrepresented that the Herbalife business opportunity could be successfully pursued at little cost;

12) Whether Defendants fraudulently represented that qualifying for, and attending, events was the key to success in the Herbalife business opportunity;

13) Whether Defendants knowingly presented financial success testimonials from people who were not having financial success;

14) Whether Defendants' disclaimers were legally insufficient given the net impression created by Circle of Success events;

15) Whether Defendants' coordinated sales and marketing tactics as they relate to Circle of Success events were inherently fraudulent and/or exploitative;

16) Whether Defendants knew or should have known that the representations made or omissions at Circle of Success events are false and misleading;

17) Whether Defendants took affirmative actions to fraudulently conceal the harm from the Class;

18) Whether Plaintiffs and Class members are entitled to damages ascertainable by common proof and methods of proof;

19) The proper measure of damages for Defendants' violations of law.

248.    These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual class members. These questions are

susceptible to common proof and methods of proof because Defendants' pattern of activity was consistent across Plaintiffs and Class members. Top distributors used standardized, coordinated methods and sales materials to deceive the Plaintiffs. Plaintiffs' allegations, if proven, will necessarily prove harm to the Class.

**Typicality**

249.    Plaintiffs' claims are typical of the Class in that Plaintiffs suffered monetary damages attending Circle of Success events after Defendants represented that such purchases were necessary to have success with the Herbalife business opportunity. Defendants used the same and/or substantially similar, false marketing materials and implemented the same and/or substantially similar manipulative tactics to exploit the Plaintiffs' and the Class members' inferior informational position.

**Adequacy of Representation**

250.    Plaintiffs will fairly and adequately represent the interests of the Class, in that Plaintiffs' interests are fully aligned with those of the Class. Plaintiffs were all damaged in the same or similar manner, by the same or similar methods used by Defendants to injure the Class. Plaintiffs have retained counsel who is experienced and skilled in complex class-action litigation.

**Requirements of Federal Rule of Civil Procedure 23(b)(3)**

251.    The questions of law or fact common to Plaintiff's and each Class Members' claims predominate over any questions of law or fact affecting only individual members of the Classes.  All claims by Plaintiffs and the unnamed Class members are based on the common course of conduct by Defendants as alleged herein.

252.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

253.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

**Superiority**

254.    A class action is superior to other methods for the fair and efficient adjudication of the controversy given that the size of the Class makes joinder of all Class members a practical impossibility.

255.    Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside throughout the country.

256.    Individual claims by Class members are impractical because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions. Class action treatment will permit a large number of similarly situated individuals to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of effort, evidence, and expense that a multitude of individual actions would engender. The issues in this case are amenable to class resolution.

257.    Plaintiffs, like most Circle of Success participants, are people of average means and could not afford to bring individual actions against Defendants. Denial of class treatment in this case would likely deny numerous Class members a remedy and the opportunity to be heard.

258.    There are no known individual Class members who are interested in individually controlling the prosecution of separate actions.

259.    The interests of justice will be well served by resolving the common disputes of potential Class members in one forum.  The class action would be manageable because it presents a limited set of causes and targets a single coordinated enterprise; with common key issues, documents, witnesses and experts, all, or a majority of which are susceptible to treatment on a class basis in a single forum.

260.    Individual suits would not be cost effective or economically maintainable as individual actions.

261.    The action is manageable as a class action.

262.    The centrality of Florida in the Circle of Success enterprise and the fact that a substantial amount of the relevant conduct has taken place in Florida warrants application of Florida substantive law to all of Plaintiffs' and Class members' claims. Alternatively, however, Plaintiffs' state law claims are readily susceptible to Class treatment by

categorization into cohesive subclasses based on similarities in state laws that would otherwise apply.

**Requirements of Federal Rule of Civil Procedure 23(b)(2)**

263.     Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct by Defendants to further the Circle of Success enterprise and engaged in the Complaint, thereby making appropriate final injunctive relief with respect to the classes as a whole.

264.     All conditions precedent to bringing this action have been met, waived or are otherwise excused.

## CAUSES OF ACTION
## COUNT I
### CONDUCTING THE AFFAIRS OF A
### RACKETEERING ENTERPRISE – RICO 18 U.S.C. § 1962(C)
**(Brought on behalf of all Plaintiffs and all Classes against All Defendants)**

265.     Plaintiffs incorporate by reference and reallege all allegations in the above paragraphs.

266.     This cause is asserted against all Defendants, and all Defendants are "persons" for purposes of 18 U.S.C. § 1962.

267.     The Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") and Plaintiffs were injured as a result.

268.     Each Defendant is a "person" capable of holding a legal or beneficial interest in property within the meaning of 18 U.S.C. Section 1961(3).

269.     Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the preceding paragraphs and as further described below.

270.     The Circle of Success is a continuous and continuing association-in-fact enterprise consisting of Herbalife and approximately 100 leadership level members of its President's Team, including the top distributors and the entities these top distributors control. The modern formulation of the Circle of Success began in 2010 when Herbalife relinquished "ownership" of the STS level event to members of "the leadership."

271.     The members of the enterprise are and have been joined in a common purpose, have relationships among each other, and have associated through time sufficient to permit

those associated to pursue the enterprise's purpose. The conspirators formed symbiotic relationships, and each member needed and depended on the participation of the other members to accomplish their common purpose of perpetuating the fraudulent Circle of Success to sustain distributor engagement for their own financial gain.

272.   The Circle of Success has a presence in most states, and it plays a central role in the business model of a multi-billion dollar publicly traded company. Top distributors actively participate in, and promote, this fraudulent enterprise across the several states. The enterprise is engaging in, and affecting, interstate commerce.

273.   Defendants jointly conduct, manage, and control the affairs of the Circle of Success enterprise.

274.   All Defendants jointly affect the strategic direction of the Circle of Success enterprise through meetings of the various Strategy & Planning Committees.

275.   The Circle of Success is a vehicle used by Defendants to carry out a pattern of racketeering activity. All Defendants engaged in a pattern of racketeering activity by continuously, repeatedly, and over a protracted period; participating in a scheme and artifice to defraud in violation of 18 U.S.C. § 1343. Top distributors participation in the scheme included by transmitting and causing others to transmit, by means of wire in interstate commerce, writings, signs, signals, pictures and sounds, all in furtherance of, and for the purposes of, executing a scheme or artifice to defraud.

276.   With these acts, Defendants have collectively persuaded hundreds of thousands of victims to invest substantial sums into attending events which are held out as the secret to becoming financially successful in a fraudulent scheme to which Defendants know financial success is not possible.

277.   The predicate acts of wire fraud are related because they have the same or similar purpose, they target the same victims, and they have the same result: hundreds of millions of dollars flowing from the Plaintiff class into the coffers of the top distributors.

278.   The conduct complained of herein has been repeated thousands of times between January 2010 and the date of filing. Further, the acts complained of herein project into the future with a threat of repetition as the event cycle continues every month in dozens of locations around the country.

279.     As a direct and proximate result of the Defendants' pattern of racketeering activity, Plaintiff Class was injured in their business and property. Each Plaintiff was induced by reason of Defendants' misrepresentations, omissions, and blatant untruths — to surrender valuable consideration in order to participate in the inherently fraudulent scheme promoted by the Defendants' racketeering enterprise.

WHEREFORE, Plaintiffs demand that judgment be entered against the Defendants, jointly and severally, in favor of Plaintiffs and the Class members as follows:

    a.  Determining that this action is a proper class action and certifying an appropriate plaintiff Class pursuant to Fed. R. Civ. P. 23;

    b.  Awarding Plaintiffs and the Class recoverable damages in an amount to be determined at trial, including an award of trebled damages as consistent with 18 U.S.C. § 1964(c), compensatory and actual damages, injunctive relief, reasonable attorneys' fees, prejudgment interest, post-judgment interest, and costs;

    c.  Granting such further relief as this Court deems just and proper.

## COUNT II
## CONSPIRACY TO CONDUCT THE AFFAIRS
## OF A RACKETEERING ENTERPRISE – 18 U.S.C. § 1962(D)
### (Brought on behalf of all Plaintiffs and all Classes against All Defendants)

280.     Plaintiffs incorporate by reference and reallege all allegations in the above paragraphs.

281.     This cause is asserted against all Defendants.

282.     Defendants have agreed and conspired to violate 18 U.S.C. § 1962(c) as set forth above in violation of 18 U.S.C. § 1962(d). Defendants have intentionally conspired and agreed to directly, and indirectly, conduct and participate in the conduct of the affairs of the Circle of Success enterprise through a pattern of racketeering activity.

283.     Defendants knew that their predicate acts of wire fraud were part of a pattern of racketeering activity and agreed to the commission of those acts to further their scheme to defraud hopeful business opportunity participants.

284.     As a direct and proximate result of Defendants' conspiracy, and the multiple overt acts taken by all Defendants in furtherance of that conspiracy, Plaintiffs have been

injured in their business and property. Plaintiffs invested substantial sums of time and money qualifying for, and attending, fraudulent Circle of Success events.

WHEREFORE, Plaintiffs demand that judgment be entered against Defendants, jointly and severally, in favor of Plaintiffs and the Class members as follows:

a. Determining that this action is a proper class action and certifying an appropriate plaintiff Class pursuant to Fed. R. Civ. P. 23;

b. Awarding Plaintiffs and the Class recoverable damages in an amount to be determined at trial, including an award of trebled damages as consistent with 18 U.S.C. § 1964(c), compensatory and actual damages, injunctive relief, reasonable attorneys' fees, prejudgment interest, post-judgment interest, and costs;

c. Granting such further relief as this Court deems just and proper.

## COUNT III

**Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**

**(Fla. Stat. §§ 501.201, *et seq.*)**

**(Brought on behalf of the Florida Plaintiffs and Florida Subclass against All Defendants)**

285.  Plaintiffs incorporate by reference and reallege Paragraphs 1 through 264 as if fully set forth herein.

286.  Plaintiffs Patricia Rodgers, Jennifer Ribalta, Izaar Valdez, and Felix Valdez (the "Florida Plaintiffs") assert this cause of action on behalf of themselves and the Florida Subclass.

287.  The Florida Plaintiffs are consumers as defined in section 501.203(7), Florida Statutes.

288.  Each defendant is engaged in trade or commerce with things of value as defined in section 501.203(8), Florida Statutes.

289.  A substantial amount of the activities related to this Amended Complaint took place in Florida, which is a nerve center of activity for the Circle of Success enterprise.

290.  Through their conduct described above, Defendants have engaged in unconscionable and deceptive acts and trade practices in violation of the FDUTPA, the stated terms of which is to protect consumers from unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

291.     Defendants acts and material omissions possessed the tendency or capacity to mislead or create the likelihood of deception.

292.     At Circle of Success events, Defendants deceptively omit or conceal: i) the true cost associated with pursuing the Herbalife business opportunity scheme, ii) the likelihood of achieving substantial success, iii) the manner in which they have achieved that success and their associated expertise in the means and methods available to consumers to achieve success, iv) their ignorance as to the true relationship between event attendance and success within the Herbalife scheme.

293.     These omissions, half-truths and misrepresentations are deceptive and have the capacity, tendency, and effect of deceiving reasonable consumers who attend those events. Reasonable consumers would believe that attending Circle of Success events has value, based on Defendants' misrepresentations to that effect.

294.     Defendants knew, or should have known, that representations that attendance at Circle of Success Events has material value were false and unfounded, and also knew that they were unqualified to teach the methods they were espousing to achieve "success" in Herbalife.

295.     Defendants made these representations and omitted or otherwise concealed important information with the intent to induce the Florida Plaintiffs, and members of the Florida Subclass, to attend Circle of Success events.

296.     The Florida Plaintiffs and the Florida Subclass have been aggrieved and have suffered losses as a result of Defendants' violations of the FDUTPA.  By virtue of the foregoing unfair, unconscionable, and deceptive acts in the conduct of trade or commerce, the Florida Plaintiffs and the members of the Florida Subclass have been substantially injured in the amount spent on tickets to certain Circle of Success events.

297.     Defendants violated the FDUTPA and aggrieved the members of the Florida Subclass.

298.     The Florida Plaintiffs have retained the undersigned attorneys to represent them in this action and have agreed to pay this firm reasonable attorneys' fees.

299.     The Florida Plaintiffs and the Florida Subclass have been harmed by the Defendants' violations of the FDUTPA.

300.    The Florida Plaintiffs and members of the Florida Subclass seek actual damages, restitution of costs associated with attending Circle of Success events.  The Florida Plaintiffs and the Florida Subclass are also entitled to an award of reasonable attorneys' fees pursuant to sections 501.2105 and 501.211, Florida Statutes.

WHEREFORE, the Florida Plaintiffs and members of the Florida Subclass demand that judgment be entered against Defendants, jointly and severally, in favor of the Florida Plaintiffs and members of the Florida Subclass as follows:

a.  Determining that this action is a proper class action and certifying an appropriate plaintiff Class pursuant to Fed. R. Civ. P. 23;

b.  Enjoining Defendants from further engaging in the aforementioned deceptive trade practices;

c.  Awarding the Florida Plaintiffs and the Florida Subclass recoverable damages in an amount to be determined at trial, including compensatory and actual damages, reasonable attorneys' fees, pre-judgment interest, post-judgment interest, and costs;

d.  Granting such further relief as this Court deems just and proper.

## COUNT IV

### Violation of Arizona's Consumer Fraud Act (the "ACFA")

### (Ariz. Rev. Stat. Ann. §§ 44-1521, *et seq.*)

### (Brought on behalf of Joanna Kirby and the Arizona Subclass against All Defendants)

301.    Plaintiffs incorporate by reference and reallege Paragraphs 1 through 264 as if fully set forth herein.

302.    Plaintiff Joanna Kirby asserts this cause of action on behalf of herself and the Arizona Subclass.

303.    Through their conduct described above, Defendants have engaged in unconscionable and deceptive acts and trade practices in violation of the ACFA, the stated terms of which is to protect consumers from unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

304.    Defendants acts and material omissions possessed the tendency or capacity to mislead or create the likelihood of deception.

305.    At Circle of Success events, Defendants deceptively omit or conceal: i) the true cost associated with pursuing the Herbalife business opportunity scheme, ii) the likelihood of achieving substantial success, iii) the manner in which they have achieved that success and their associated expertise in the means and methods available to consumers to achieve success, iv) their ignorance as to the true relationship between event attendance and success within the Herbalife scheme.

306.    These omissions, half-truths and misrepresentations are deceptive and have the capacity, tendency, and effect of deceiving reasonable consumers who attend those events. Reasonable consumers would believe that attending Circle of Success events has value, based on Defendants' misrepresentations to that effect.

307.    Defendants knew, or should have known, that representations that attendance at Circle of Success Events has material value were false and unfounded, and also knew that they were unqualified to teach the methods they were espousing to achieve "success" in Herbalife.

308.    Defendants made these representations and omitted or otherwise important information with the intent to induce Ms. Kirby, and members of the Arizona Subclass, to attend Circle of Success events.

309.    Plaintiff Joanna Kirby, and members of the Arizona Subclass have been aggrieved and have suffered losses as a result of Defendants' violations of the ACFA.  By virtue of the foregoing unfair, unconscionable, and deceptive acts in the conduct of trade or commerce, Plaintiff Joanna Kirby, and members of the Arizona Subclass have been substantially injured in the amount spent attending Circle of Success events.

310.    Defendants violated the ACFA and aggrieved the members of the Arizona Subclass.

311.    Plaintiff Joanna Kirby has retained the undersigned attorneys to represent her in this action and has agreed to pay this firm reasonable attorneys' fees.

312.    Plaintiff Joanna Kirby and members of the Arizona Subclass have been harmed by the Defendants' violations of the ACFA.

313.    Plaintiff Joanna Kirby and members of the Arizona Subclass seek actual damages, restitution of costs associated with attending Circle of Success events.

WHEREFORE, Plaintiff Joanna Kirby and members of the Arizona Subclass demand that judgment be entered against Defendants, jointly and severally, in favor of the Plaintiff Joanna Kirby and members of the Arizona Subclass as follows:

a. Determining that this action is a proper class action and certifying an appropriate plaintiff Class pursuant to Fed. R. Civ. P. 23;

b. Enjoining Defendants from further engaging in the aforementioned deceptive trade practices;

c. Awarding Plaintiff Joanna Kirby and members of the Arizona Subclass recoverable damages in an amount to be determined at trial, including compensatory and actual damages, pre-judgment interest, post-judgment interest, and costs;

d. Granting such further relief as this Court deems just and proper.

## <u>COUNT V</u>

### Violation of Oklahoma's Consumer Protection Act (the "OCPA")

### (Okla. Stat. Ann. 15 §§ 751, *et seq.*)

### (Brought on behalf of Cody Pyle and the Oklahoma Subclass against All Defendants)

314. Plaintiffs incorporate by reference and reallege Paragraphs 1 through 264 as if fully set forth herein.

315. Plaintiff Cody Pyle asserts this cause of action on behalf of himself and the Oklahoma Subclass.

316. Through their conduct described above, Defendants have engaged in unconscionable and deceptive acts and trade practices in violation of the OCPA, the stated terms of which is to protect consumers from unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

317. Defendants acts and material omissions possessed the tendency or capacity to mislead or create the likelihood of deception.

318. At Circle of Success events, Defendants deceptively omit or conceal: i) the true cost associated with pursuing the Herbalife business opportunity scheme, ii) the likelihood of achieving substantial success, iii) the manner in which they have achieved that success and their associated expertise in the means and methods available to consumers to achieve

success, iv) their ignorance as to the true relationship between event attendance and success within the Herbalife scheme.

319.   These omissions, half-truths and misrepresentations are deceptive and have the capacity, tendency, and effect of deceiving reasonable consumers who attend those events. Reasonable consumers would believe that attending Circle of Success events has value, based on Defendants' misrepresentations to that effect.

320.   Defendants knew, or should have known, that representations that attendance at Circle of Success Events has material value were false and unfounded, and also knew that they were unqualified to teach the methods they were espousing to achieve "success" in Herbalife.

321.   Defendants made these representations and omitted or otherwise important information with the intent to induce Mr. Pyle, and members of the Oklahoma Subclass, to attend Circle of Success events.

322.   Plaintiff Cody Pyle and members of the Oklahoma Subclass have been aggrieved and have suffered losses as a result of Defendants' violations of the OCPA.  By virtue of the foregoing unfair, unconscionable, and deceptive acts in the conduct of trade or commerce, Plaintiff Cody Pyle and members of the Oklahoma Subclass have been substantially injured in the amount spent attending Circle of Success events.

323.   Defendants violated the OCPA and aggrieved the members of the Arizona Subclass.

324.   Plaintiff Cody Pyle has retained the undersigned attorneys to represent him in this action and has agreed to pay this firm reasonable attorneys' fees.

325.   Plaintiff Cody Pyle and members of the Oklahoma Subclass have been harmed by the Defendants' violations of the OCPA.

326.   Plaintiff Cody Pyle and members of the Oklahoma Subclass seek actual damages, restitution of costs associated with attending Circle of Success events.

WHEREFORE, Plaintiff Cody Pyle and members of the Oklahoma Subclass demand that judgment be entered against Defendants, jointly and severally, in favor of the Plaintiff Cody Pyle and members of the Oklahoma Subclass as follows:

> e.   Determining that this action is a proper class action and certifying an appropriate plaintiff Class pursuant to Fed. R. Civ. P. 23;

    f.  Enjoining Defendants from further engaging in the aforementioned deceptive trade practices;

    g.  Awarding Plaintiff Cody Pyle and members of the Oklahoma Subclass recoverable damages in an amount to be determined at trial, including compensatory and actual damages, pre-judgment interest, post-judgment interest, reasonable attorneys' fees, and costs;

    h.  Granting such further relief as this Court deems just and proper.

**COUNT VI**

**Civil Conspiracy**

**(Brought on behalf of all Plaintiffs and all Classes against All Defendants)**

327.    Plaintiffs incorporate by reference and reallege Paragraphs 1 through 264 as if fully set forth herein.

328.    Defendants entered into an agreement to collectively promote the Circle of Success event system to achieve personal financial gain to the detriment of the attendees of these worthless events. The Defendants specifically agreed to promote the utility of Event attendance in order to assure continued engagement and participation of the Plaintiffs and the Class. The Defendants did so while knowing that the events were not valuable, that it was fraudulent and deceptive to position themselves as "experts" qualified to teach attendees about retail sales, and that there was no discernible relationship between event attendance and success in Herbalife.

329.    That agreement was unlawful.

330.    Defendants engaged in several overt acts to further the conspiracy including, but not limited to, the following:

    a)  Participating in S&P Committee Meetings;

    b)  Creating agendas and speaker lineups for Circle of Success events;

    c)  Crafting representations to be made at Circle of Success events that they knew to be false;

    d)  Promoting the Circle of Success through social media; and

    e)  Otherwise supporting the Circle of Success System.

331.    As a direct and proximate result of Defendants' wrongful actions, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs demand that judgment be entered against Defendants, jointly and severally, in favor of Plaintiffs as follows:

   a. Determining that this action is a proper class action and certifying an appropriate plaintiff Class pursuant to Fed. R. Civ. P. 23;

   b. Awarding Plaintiffs and the members of the Plaintiffs' Class recoverable damages in an amount to be determined at trial, including direct and consequential damages, pre-judgment interest, post-judgment interest, and costs; and

   c. Granting such further relief as this Court deems just and proper.

## COUNT VII

### Unjust Enrichment

### (Brought on behalf of all Plaintiffs and all Classes against All Defendants)

332.    Plaintiffs incorporate by reference and reallege Paragraphs 1 through 264 as if fully set forth herein.

333.    Plaintiffs conferred a benefit onto Defendants by purchasing tickets to STS events.

334.    Defendants voluntarily accepted and retained those benefits.

335.    It would be inequitable under the circumstances for Defendants to retain the benefits.

WHEREFORE, Plaintiffs demand that judgment be entered against Defendants, jointly and severally, in favor of Plaintiffs as follows:

   a. Determining that this action is a proper class action and certifying an appropriate plaintiff Class pursuant to Fed. R. Civ. P. 23;

   b. Awarding Plaintiffs and the members of the Plaintiffs' Class recoverable damages in an amount to be determined at trial, including direct and consequential damages, pre-judgment interest, post-judgment interest, and costs; and

   c. Granting such further relief as this Court deems just and proper.

## PUNITIVE DAMAGES

Plaintiffs reserve the right to seek leave of Court to assess punitive damages against Defendants.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.


DATED:  October 23, 2020                                    Respectfully submitted,

                                                           **MARK MIGDAL & HAYDEN**
                                                           80 S.W. 8th Street, Suite 1999
                                                           Miami, Florida 33130
                                                           Telephone: (305) 374-0440

                                                           By: *s/ Etan Mark*
                                                               Etan Mark, Esq.
                                                               Florida Bar No. 720852
                                                               Yaniv Adar, Esq.
                                                               Florida Bar No. 63804
                                                               Niki Namazi, Esq.
                                                               Florida Bar No. 1018346
                                                               etan@markmigdal.com
                                                               yaniv@markmigdal.com
                                                               niki@markmigdal.com
                                                               eservice@markmigdal.com

                                                           AND

                                                               Jason Jones, Esq.
                                                               Ohio Bar No. 0095384
                                                               jason@jonesatlaw.com




## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on October 23, 2020, I filed the foregoing electronically through the Court's CM/ECF system, which caused the following parties or counsel to be served by electronic means.

                                          By: *s/ Etan Mark*
                                              Etan Mark, Esq.